# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| **CHANDLER MOORE and** | ) | |
| **MOWORKS LLC,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:25-cv-5635 |
| v. | ) | |
| | ) | |
| **NORMAN GYAMFI, INSIGNIA** | ) | |
| **HOLDING COMPANY, INSIGNIA** | ) | |
| **ASSETS, LLC, TRIBL PUBLISHING** | ) | |
| **INC., TRIBL RECORDS, LLC,** | ) | |
| **MAVERICK CITY MUSIC, INC.,** | ) | |
| **And MAVERICK CITY MUSIC** | ) | |
| **PUBLISHING, LLC,** | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| **MAVERICK CITY MUSIC, INC. and** | ) | |
| **MAVERICK CITY PUBLISHING,** | ) | |
| **LLC,** | ) | |
| | ) | |
| Counter-Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **CHANDLER MOORE,** | ) | |
| | ) | |
| Counter-Defendant. | ) | |
| _____ | ) | |

**TRIBL MUSIC GROUP, LLC,**                )
                                           )
                Intervenor,                )
                                           )
v.                                         )
                                           )
**CHANDLER MOORE and**                     )
**MOWORKS LLC,**                           )
                                           )
                Counter-Defendants.        )
_____  )


## TRIBL MUSIC GROUP, LLC'S MEMORANDUM OF LAW IN SUPPORT OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................1

Factual Background ................................................................................3

   I.   The Parties Entered Into a Valid, Binding Agreement. ................3

   II.   Tribl Music Group is the Proper Party to this Application for
        Injunctive Relief ..................................................................5

   III.  Moore imminently threatens to release music in violation of
        the Deal Memo .....................................................................6

Legal standard ........................................................................................7

Argument ................................................................................................8

   I.   Tribl Music Group Has a Substantial Likelihood of Success
        on the Merits. .......................................................................8

      A.   The Deal Memo is a valid and binding agreement under Georgia law. 9

      B.   Absent Court intervention, Moore will commit a material breach of
      the Deal Memo on or about January 30, 2026. ..........................9

      C.   Moore's release will cause non-de minimis damages to Tribl Music
      Group. .................................................................................10

   II.   Tribl Music Group Will Suffer Irreparable Harm in the
        Absence of Injunctive Relief. ...............................................11

   III.  The Balance of Harms Favors Tribl Music Group. ..................18

   IV.  Granting Injunctive Relief Will Not Adversely Affect Public
        Policy or the Public Interest. ................................................19

   V.   The Requested Relief is Narrowly Tailored to Preserve the Status Quo.. 20

Conclusion ............................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bates v. JPMorgan Chase Bank, NA*,
    768 F.3d 1126 (11th Cir. 2014) ..........................................................................8

*BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*,
    425 F.3d 964 (11th Cir. 2005) ..........................................................................11

*C-Mobile Ads v. C-Mobility Adver.*,
    No. 07-CV-61471 (WPD), 2007 U.S. Dist. LEXIS 116472 (S.D. Fla. Oct. 22, 2007) ..........................................................................13

*Charles Schwab & Co., Inc. v. McMurry*,
    No. 2:08-cv-534 (FTM), 2008 U.S. Dist. LEXIS 104140 (M.D. Fla. Dec. 23, 2008) ..........................................................................18

*Coastal Logistics, Inc. v. Centerpoint Garden City*,
    No. CV412-294, 2013 U.S. Dist. LEXIS 195991 (S.D. Ga. Dec. 3, 2013) ..........................................................................12

*Developers Sur. and Indem. Co. v. Bi-Tech Const., Inc.*,
    964 F. Supp. 2d 1304 (S.D. Fla. 2013) ..........................................................19

*Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc.*,
    244 F. Supp. 3d 1368 (N.D. Ga. 2017) ..........................................................11

*Ferrellgas Partners, L.P. v. Barrow*,
    143 Fed. Appx. 180 (11th Cir. 2005) ..............................................................11

*Imaging Business Machines, LLC. v. BancTec, Inc.*,
    459 F.3d 1186 (11th Cir. 2006) ........................................................................7

*Kelly v. Primco Mgmt., Inc.*,
    2015 U.S. Dist. LEXIS 181288 (C.D. Cal. Jan. 12, 2015) ...............................12

*KH Outdoor, LLC v. City of Trussville*,
    458 F.3d 1261 (11th Cir. 2006) ........................................................................7

*Kuritzky v. Emory Univ.*,
    294 Ga. App. 370 (Ga. Ct. App. 2008)................................................8

*Lions Gate Films Inc. v. Doe*,
    No. 2:14-cv-06033 (MMM) (AGR), 2014 U.S. Dist. LEXIS
    110032 (C.D. Cal. Aug. 8, 2014).......................................................11

*MEDai Inc. v. Quantros, Inc.*,
    No. 6:12-cv-840 (ORL) (GJK), 2012 U.S. Dist. LEXIS 115504
    (M.D. Fla. Aug. 16, 2012) ................................................................12

*Ne. Fla. Chapter of Assn. of Gen. Contractors of Am. v. City of
    Jacksonville*,
    896 F.2d 1283 (11th Cir. 1990) ........................................................10

*Paisley Park Enters., Inc. v. Boxill*,
    253 F. Supp. 3d 1037 (D. Minn. 2017)..............................................11

*Siegel v. LePore*,
    234 F.3d 1163 (11th Cir. 2000) ........................................................10

*SOS Mobile Med. Care, LLC v. Gulledge*,
    No. 8:25-cv-03422 (WFJ) (CPT), 2025 U.S. Dist. LEXIS 259307
    (M.D. Fla. Dec. 16, 2025)..................................................................16

*Yorktown Sys. Grp., Inc. v. Threat Tec LLC*,
    108 F.4th 1287 (11th Cir. 2024) ..................................................12, 18

Intervenor Tribl Music Group, LLC ("Tribl Music Group") respectfully submits this *Memorandum of Law in Support of a Temporary Restraining Order and Preliminary Injunction* against Plaintiffs and Counter-Defendants Chandler Moore ("Moore") and Moworks LLC (together, Moore and Moworks LLC are the "Plaintiffs") for breach of contract.[1]

## INTRODUCTION

On April 18, 2024, Moworks LLC f/s/o Chandler Moore and Tribl Music Group entered into a deal memo (the "Deal Memo") under which, among other things, Plaintiffs agreed to write, record, and perform music (the "Compositions") and "[a]ll recordings will be owned by Moore and **exclusively licensed to [Tribl Music Group] until seven (7) years following the later of: (i) the end of the Term and (ii) recoupment**" in exchange for certain royalties. (ECF No. 1, Ex. A (hereinafter "Deal Memo"), p. 2 (OWNERSHIP/LICENSE TERM).) Tribl Music Group seeks to enforce the Deal Memo to ***prevent an imminent, unauthorized song release of "God I'm Just Grateful" scheduled <u>on or about January 30, 2026</u>,*** that would violate the Deal Memo and would irreparably deprive Tribl Music Group of its bargained-for right to control the musical releases of Moore's recordings.

---

[1] Concurrently with this filing, Tribl Music Group filed its Application to Intervene ("Application") and Complaint in Intervention, seeking to join this litigation.

Licensing music is the lifeblood of distribution companies like Tribl Music Group, and is critical to Tribl Music Group's ability to market and sell music, including music written by Plaintiffs. Moore is a well-known artist and the former face of Tribl Music Group affiliate, Maverick City Music. In this capacity, Moore was the lead singer, main songwriter, most recognizable member, and most prioritized. He was positioned by Tribl Music Group for key opportunities by Tribl Music Group, including collaborations with well-known musicians like Justin Bieber, and promoted through global tours. Tribl Music Group invested millions of dollars into Moore's brand and career, as both a solo artist and a member of Maverick City Music, including hundreds of thousands of dollars pursuant to the Deal Memo.

On or about January 14, 2026, Tribl Music Group discovered Moore's plans to release a solo version of "God I'm Just Grateful" on or about January 30, 2026, without authorization from Tribl Music Group. The release has already been scheduled with third-party digital service providers who market and distribute music. This threat of Moore's release of a solo album is therefore not speculative. Moore has disregarded the Deal Memo's exclusivity requirements by writing, recording, and releasing Compositions without authorization, depriving Tribl Music Group of its exclusive license to the Compositions. (Deal Memo, p. 1 (SERVICES); p.2 (OWNERSHIP/LICENSE TERM).)

Moore's solo release threatens irreparable harm to the value of Tribl Music Group's exclusive license. As discussed below, courts faced with similar situations have held that the loss of contractual rights to control the release of licensed artistic material constitutes irreparable harm. Judicial intervention is necessary to prevent Plaintiffs from depriving Tribl Music Group of the rights acquired under its license, and causing irreparable harm and disruption to Tribl Music Group and its remaining artists.

Tribl Music Group therefore seeks narrow relief to preserve the status quo and prevent the imminent breach while the Court adjudicates the parties' contractual rights.

## FACTUAL BACKGROUND

### I.    The Parties Entered Into a Valid, Binding Agreement.

On April 18, 2024, Moore and Tribl Music Group, LLC executed the Deal Memo governing Moore's "exclusive personal services in connection with the recording of audio and audiovisual recordings containing Moore's performances, as well as live concert performance dates[.]" (Deal Memo, p. 1 (SERVICES); Declaration of Erik J. Gaines ("Gaines Decl."), ¶ 6.)

Under the Deal Memo, Plaintiffs agreed that "[a]ll recordings will be owned by Moore and **exclusively licensed to TRIBL until seven (7) years following the later of: (i) the end of the Term and (ii) recoupment**." (Deal Memo, p. 2

(OWNERSHIP/LICENSE TERM).) The exclusive license continues and has not been terminated through either the end of the Term or recoupment. (Gaines Decl., ¶ 10.)

Moore further agreed to "render his exclusive personal services in connection with the recording of audio and audiovisual recordings containing [his] performances," as well as specified live concert performance dates. (Deal Memo, p. 1 (SERVICES), p. 3 (TOURING).) In exchange, Tribl Music Group agreed to advance Moore substantial funds for recording, touring, and related costs and to commercially exploit Moore's recordings and performances on an exclusive basis. (Deal Memo, pp. 1-3 (RECORDING FUND/ARTIST ADVANCE; NET PROFITS; MARKETING COMMITMENT; TOURING).)

The Deal Memo provides that all creative matters relating to recordings released under the agreement are subject to mutual approval, with Tribl Music Group's good-faith decision controlling in the event of disagreement. (Deal Memo, p. 2 (CREATIVE).)

The Deal Memo required Moore to deliver one album comprised of at least ten newly recorded mastered recordings featuring Moore's primary performances. (Deal Memo, p. 1 (TERM/PRODUCT COMMITMENT).) The Deal Memo covers "[a]ll musical works written and/or composed by Moore (whether alone or with

- 4 -

others) during the Term ('Compositions')." (Deal Memo, p. 4 (MUSIC PUBLISHING).)

The Deal Memo provides that it is legally binding on the parties unless and until a longer, formal agreement is executed. (Deal Memo, p. 5 (MISCELLANEOUS).) Moore and MoWorks LLC were represented by counsel during the Deal Memo's negotiation and execution, and all signatures were collected through Plaintiffs' counsel. (Deal Memo, pp. 6–11.)

Tribl Music Group performed its obligations under the Deal Memo by advancing Moore substantial capital toward recording costs, touring, and guaranteed performance fees. (Deal Memo, pp. 1-3 (RECORDING FUND/ARTIST ADVANCE; TOURING).)

## II. Tribl Music Group is the Proper Party to this Application for Injunctive Relief

Tribl Music Group has contemporaneously filed a Motion to Intervene, with Proposed Complaint in this action (the Application), as Tribl Music Group, not any

of the Defendants, is the proper party to the Deal memo. TRIBL is defined in the Deal Memo as Tribl Music Group. (Deal Memo, p. 1.)

---

**DEAL MEMO**

**Between MoWorks LLC f/s/o CHANDLER MOORE ("Moore") and TRIBL MUSIC GROUP ("TRIBL")**

---

As outlined in the Application accompanying motion, and the pending Motion to Dismiss filed by Defendants Insignia Holding Company, Insignia Assets, LLC, Tribl Publishing Inc., Tribl Records, LLC, Maverick City Music, Inc., Maverick City Music Publishing, LLC and Norman Gyamfi (the "Motion to Dismiss"), Plaintiffs sued **non-parties** to the Deal Memo. Through Plaintiffs' Complaint they seek to terminate and avoid Tribl Music Group's contractual rights under the Deal Memo without Tribl Music Group's participation in this litigation. As demonstrated by Plaintiffs' anticipated breach of the Deal Memo, Tribl Music Group is a necessary party to this litigation to protect its rights.

## III.   Moore imminently threatens to release music in violation of the Deal Memo.

Moore is poised to imminently release new music in violation of the exclusive license Plaintiffs granted Tribl Music Group. (Gaines Decl., ¶¶ 9-10, 12.) Under the Deal Memo, Moore is prohibited from releasing or authorizing the distribution of recordings because the exclusive license to distribute any of Plaintiffs' songs was

granted to Tribl Music Group. (Deal Memo, pp. 1–2 (SERVICES; CREATIVE); Gaines Decl., ¶¶ 8-10.)[2]

On or about January 14, 2026, Tribl Music Group discovered Moore's plans to release a solo version of "God I'm Just Grateful" on or about January 30, 2026, without authorization from Tribl Music Group. (Gaines Decl., ¶ 12.) The release has already been planned with third-party digital service providers who market and distribute music. (Gaines Decl., ¶ 3.) The planned release would occur during the term of the Deal Memo, and would not be distributed by Tribl Music Group. (Deal Memo, pp. 1-2, 4 (SERVICES; OWNERSHIP/LICENSE TERM; MUSIC PUBLISHING); Gaines Decl., ¶¶ 8-10.) Tribl Music Group has not issued any written waiver, carve-out, or authorization permitting the planned January 30, 2026 release, and Moore has not requested any such waiver. (Gaines Decl., ¶¶ 12, 28.)

## LEGAL STANDARD

A court may issue a temporary restraining order and preliminary injunction if the movant shows: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened

---

[2] "Authorized channels" means releases distributed through Tribl Music Group's designated distribution partners and clearance process, following internal clearance and approval requirements. (Deal Memo, pp. 1-2 (SERVICES; OWNERSHIP/LICENSE TERM); Gaines Decl., ¶¶ 10, 17, 28.)

injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006) (citation omitted). When considering a motion for preliminary injunction, a district court may assess the relative strength and persuasiveness of the evidence presented by the parties and is not required to resolve factual disputes in favor of the non-moving party. *See Imaging Business Machines, LLC. v. BancTec, Inc.*, 459 F.3d 1186, 1192 (11th Cir. 2006).

## ARGUMENT

### I.  Tribl Music Group Has a Substantial Likelihood of Success on the Merits.

Tribl Music Group asserts a claim for breach of contract under Georgia law. To prevail on such a claim, a plaintiff must show: (1) a breach of contract; (2) resulting damages; and (3) that the damages were suffered by a party entitled to complain of the breach. *Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126, 1130 (11th Cir. 2014) (citing *Norton v. Budget Rent A Car Sys., Inc.*, 307 Ga. App. 501, 502, 705 S.E.2d 305, 306 (Ga. Ct. App. 2010)). The breach complained of "must be more than de minimus and substantial compliance with the terms of the contract is all that the law requires." *Kuritzky v. Emory Univ.*, 294 Ga. App. 370, 371, 669 S.E.2d 179 (Ga. Ct. App. 2008).

Tribl Music Group is likely to succeed on each element. The Deal Memo is a valid and enforceable contract; Plaintiffs materially breached the core songwriting, exclusivity, and licensing provisions; and those breaches caused concrete harm to Intervenor's contractual rights and commercial interests.

A.     <u>The Deal Memo is a valid and binding agreement under Georgia law.</u>

The Deal Memo is a valid and enforceable contract. Moore executed the Deal Memo with counsel, accepted substantial consideration, and performed under it. The Deal Memo expressly states that it is binding unless and until replaced by a formal contract, which has not occurred. Nothing in the record suggests the Deal Memo is provisional, unenforceable, or nonbinding.

B.     <u>Absent Court intervention, Moore will commit a material breach of the Deal Memo on or about January 30, 2026.</u>

Moore intends to commit a material breach of the Deal Memo by releasing a solo version of "God I'm Just Grateful" on or about January 30, 2026, without authorization from Tribl Music Group, in direct violation of the agreement's exclusivity provisions. (Gaines Decl., ¶¶ 10, 12; *see* Deal Memo, pp. 1-2, 4 (SERVICES; OWNERSHIP/LICENSE TERM; MUSIC PUBLISHING).) Tribl Music Group learned that the release is imminent and is being planned . (Gaines Decl., ¶¶ 12, 30.) By entering into distribution agreements for the song outside of his contractual relationship with Tribl Music Group, Moore has breached the Deal

Memo's obligation that all recordings are "exclusively licensed to TRIBL." (Deal Memo, p. 1 (SERVICES), p.2 (OWNERSHIP/LICENSE TERM).)

    C.    <u>Moore's release will cause non-de minimis damages to Tribl Music Group.</u>

Moore's planned release on or about January 30, 2026, will cause non-de minimis damages to Tribl Music Group under the Deal Memo. (Gaines Decl., ¶¶ 13, 23-25; *see* Deal Memo, pp. 1–2, 4 (SERVICES; CREATIVE; OWNERSHIP/LICENSE TERM; MUSIC PUBLISHING).)

The release would deprive Tribl Music Group of the benefit of its negotiated exclusivity by circumventing the contractual framework governing licensing and authorized releases. (Gaines Decl., ¶¶ 10, 14-16.) The Deal Memo grants Tribl Music Group an exclusive license to Plaintiff's Compositions—licensing music is the lifeblood of distribution companies like Tribl Music Group and is critical to Tribl Music Group's ability to market and sell music, including music written by Plaintiffs. (Deal Memo, pp. 1-2, (SERVICES; CREATIVE; OWNERSHIP/LICENSE TERM); Gaines Decl., ¶¶ 8-11.) Tribl Music Group also has the exclusive right to control the timing, distribution, and exploitation of recordings embodying Moore's performances during the license term. (*Id.*) As described in greater detail below regarding irreparable harm, these damages would be disruptive, expensive, and would have irreparable collateral consequences for Tribl Music Group and its other musicians.

**II.    Tribl Music Group Will Suffer Irreparable Harm in the Absence of Injunctive Relief.**

Absent injunctive relief, Moore's planned release on or about January 30, 2026, will cause irreparable harm to Tribl Music Group. Irreparable injury is "the sine qua non of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted). An injury is irreparable if it "cannot be undone through monetary remedies," *Ne. Fla. Chapter of Assn. of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

Consistent with these principles, the Eleventh Circuit has recognized that the loss of goodwill, loss of customers, and loss of control over contractual rights constitute irreparable harm. *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005). District courts in this Circuit likewise recognize irreparable harm where unauthorized conduct creates a substantial risk of customer or audience confusion and resulting injury to goodwill and reputation. *See Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc.*, 244 F. Supp. 3d 1368, 1384 (N.D. Ga. 2017) (finding irreparable harm established in the form of loss of control of reputation and goodwill absent showing of loss of business). Courts also find irreparable injury where ongoing conduct results in loss of control over reputation, loss of trade, and erosion of goodwill. *Ferrellgas Partners, L.P. v. Barrow*, 143 Fed. Appx. 180, 190 (11th Cir. 2005).

In cases like this one, federal district courts addressing unauthorized pre-release dissemination of creative works have held that the loss of control over first release constitutes irreparable harm. For example, in *Lions Gate Films Inc. v. Doe*, the court held that pre-release distribution of a film irreparably harmed the plaintiff by "impair[ing] [its] exclusive control over . . . its right of first publication." No. 2:14-cv-06033 (MMM) (AGRx), 2014 U.S. Dist. LEXIS 110032, at *14–15 (C.D. Cal. Aug. 8, 2014). Similarly, in *Paisley Park Enters., Inc. v. Boxill*, the court concluded that the unauthorized release of previously unreleased recordings irreparably harmed the plaintiffs' right to control confidential works and the artist's public persona. 253 F. Supp. 3d 1037, 1049–51 (D. Minn. 2017). And in *Kelly v. Primco Mgmt., Inc.*, the court held that the threatened deprivation of a recording artist's right to control when a song is published, if ever, can itself constitute irreparable harm. No. CV 14-07263 BRO (SHx), 2015 U.S. Dist. LEXIS 181288, at *44–45 (C.D. Cal. Jan. 12, 2015).

Courts in the Eleventh Circuit issues injunctive relief to preserve the status quo and prevent imminent conduct that would irreversibly alter the parties' contractual positions before the court can adjudicate the merits. Recently, the Eleventh Circuit reaffirmed that district courts may issue injunctive relief to preserve the status quo and prevent imminent conduct that would deprive a party of its bargained-for contractual rights while the merits are adjudicated. *Yorktown Sys.*

*Grp., Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1290, 1298–99 (11th Cir. 2024). *See also, e.g., Coastal Logistics, Inc. v. Centerpoint Garden City*, No. CV412-294, 2013 U.S. Dist. LEXIS 195991, at *6–8 (S.D. Ga. Dec. 3, 2013) (granting emergency injunctive relief to stop termination of a commercial lease where eviction would "significantly undermine [plaintiff's] position in this litigation" and impair the court's ability to resolve the dispute after a hearing); *MEDai Inc. v. Quantros, Inc.*, No. 6:12-cv-840 (ORL) (GJK), 2012 U.S. Dist. LEXIS 115504, at *7–8 n.9 (M.D. Fla. Aug. 16, 2012) (issuing preliminary injunctive relief to halt ongoing contractual breaches in order to maintain the parties' existing contractual relationship pending adjudication on the merits); *C-Mobile Ads v. C-Mobility Adver.*, No. 07-CV-61471 (WPD), 2007 U.S. Dist. LEXIS 116472, at *7–8 (S.D. Fla. Oct. 22, 2007) (entering injunctive relief to preserve the status quo where imminent conduct threatened to displace the plaintiff from its contractual position before the court could conduct further proceedings).

The unauthorized release will interfere with Tribl Music Group's planned release schedule, marketing coordination, and sequencing of artist releases across its roster. (Gaines Decl., ¶¶ 21-24.) That interference diminishes the value of Tribl Music Group's exclusive license and disrupts its contractual expectations regarding release timing and coordination. (*Id.* ¶¶ 12–15, 21.) There is limited inventory available for support on streaming platforms and Tribl Music Group strives to avoid

releasing music between two competitive artists or genres on the same day as it could impede the ability of each to be successful—additionally, in an online streaming environment momentum matters and social media activity, algorithmic lift, and timing all compound to drive the success of individual songs, albums, branding, and long-term platform visibility. Once that momentum is diverted or diluted, it cannot be recreated or repaired after the fact. (*Id.* ¶ 22.)

Additionally, the unauthorized release on or about January 30th will impair Tribl Music Group's relationships with its distribution partners and digital service providers, which depend on adherence to agreed clearance, approval, and release processes. (Gaines Decl., ¶¶ 13, 16-20.) Tribl Music Group collaborates and contracts with digital service providers ("DSPs"), playlist editors, collaborators and other industry partners. Tribl Music Group's distribution relationships rely heavily on trust, predictability, and clear internal controls over releases. (*Id.* ¶ 17.) If an artist signed to Tribl Music Group bypasses the distribution pathway through Tribl Music Group to DSPs and other release platforms, it undermines the trust Tribl Music Group has cultivated and can create operational friction, disrupted pitching strategies, and administrative burdens for DSPs. (*Id.*) This results in a loss of trust that causes reduced flexibility, slower responsiveness, or diminished willingness by Tribl Music Group's partners to invest resources or prioritize any Tribl Music Group future releases, including those for other innocent musicians. (*Id.*)

There is a meaningful risk that such conduct could negatively affect Tribl Music Group's reputation for professionalism and control in the marketplace. Labels and distributors are not only judged on the quality of the musicians they represent but also on their ability to manage artists, enforce agreements, and deliver clean, coordinated rollouts. (Gaines Decl., ¶ 18.)  Repeated or unaddressed breaches (including unauthorized releases) could impair Tribl Music Group's credibility when negotiating future distribution arrangements, partnerships, or strategic opportunities, as counterparties may perceive heightened execution or compliance risk. (*Id.*)

The goodwill risk is particularly high where the unauthorized release results in public takedowns of songs, catalog inconsistencies across DSPs, or confusion around representation. (Gaines Decl., ¶ 19.) As Moore has been one of the most visible and successful artists signed to Tribl Music Group, other artists signed with Tribl Music Group may believe that they can breach their agreements and release their own music, as well, with little or no consequences, seeing this as an alternative to their contractual exclusivity provisions. (*Id.*)

Further, third-party partners, including concert promoters, DSPs, event hosts, and marketing companies, may become reluctant to enter into or expand agreements if they believe that Tribl Music Group cannot ensure exclusivity, prevent circumvention, or maintain a unified release strategy across its roster. (Gaines Decl., ¶ 20). While a single incident may be manageable if resolved swiftly, failure to

prevent future breaches increases the likelihood of reputational erosion that affects future negotiations, leverage, and long-term strategic relationships. (*Id.*).

In sum, Moore's planned January 30, 2026, release presents the precise circumstances warranting injunctive relief to preserve the status quo and prevent irreparable harm. Under the Deal Memo, Tribl Music Group holds an exclusive license to the planned released song, including the exclusive contractual right to control the timing, distribution, and coordinated exploitation of recordings embodying Moore's performances during the license term. (Deal Memo, p. 2 (OWNERSHIP/LICENSE TERM); *see* Gaines Decl., ¶ 11.) As described above, the release would defeat that right by (1) essentially terminating Tribl Music Group's license over the Compositions, including the right to direct or control their release; (2) damaging Tribl Music Group's strategic release calendar, including negatively impacting other musicians with scheduled release dates; and (3) impairing Tribl Music Group's relationships and contractual rights, including creating long-term mistrust by DSPs or other critical third-parties that Tribl Music Group's contracts with musicians will be honored by the musicians. *See* Argument Sec. I.C. Once the recording is released, Tribl Music Group's bargained-for control over licensed music, including first publication, release timing, and coordinated exploitation, is permanently lost and the irreparable damaging downstream effects of the competing release date on Tribl Music Group's other artists and loss of trust and goodwill on

Tribl Music Group's contractual relationships cannot be corrected by money damages alone.

That loss cannot be remedied through monetary damages. An unauthorized pre-release would disrupt Tribl Music Group's release schedule, undermine its coordinated marketing strategy, impair relationships with digital service providers, and create marketplace and audience confusion that harms goodwill and reputation. *See SOS Mobile Med. Care, LLC v. Gulledge*, No. 8:25-cv-03422 (WFJ) (CPT), 2025 U.S. Dist. LEXIS 259307, at *6 (M.D. Fla. Dec. 16, 2025) (citing *Ferrero v. Assoc. Mat., Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)) (movant demonstrated immediate, irreparable harm where there was a loss of customer goodwill and relationships).

The harm from the unauthorized release on or about January 30th is also imminent. The release date is being planned for within digital service provider systems, and Moore has actively promoted it without authorization. In the absence of judicial intervention, irreparable harm and substantial change in the status quo will result from Plaintiffs planned ongoing breaches of the Deal Memo through releasing the new song.

The relief sought is narrowly tailored to prevent the irreversible loss of Tribl Music Group's contractual right to control the first release of Moore's recordings. Tribl Music Group seeks only to preserve the pre-release status quo by prohibiting a single, imminent, unauthorized release pending resolution of the merits. Absent such

relief, the Court's ability to adjudicate the parties' contractual rights would be undermined by an irreversible release. Plaintiffs should not be permitted to use this litigation as a tool to side-step their contractual obligations while the case is pending and before the Court has an opportunity to reach the merits of the dispute. Otherwise, any artist may effectively sidestep an exclusivity agreement simply by filing suit without ever prevailing on the merits of his or her claim.

## III.    The Balance of Harms Favors Tribl Music Group.

The balance of harms strongly favors Tribl Music Group. Tribl Music Group seeks only to prevent a single, imminent release that would violate the Deal Memo and permanently defeat the exclusive licensing rights for which it bargained.

Granting injunctive relief would impose no cognizable hardship on Moore beyond requiring him to comply with obligations he voluntarily assumed. Courts routinely discount alleged harm where an injunction merely restrains conduct that is contractually prohibited or otherwise beyond the defendant's legal entitlement. *Yorktown Sys. Grp., Inc.*, 108 F.4th at 1290, 1298–99.

Absent injunctive relief, however, Tribl Music Group will suffer continuing harm to its exclusive contractual license, as well as its coordinated release strategy, and industry relationships—harm that cannot be undone once the release occurs. *See* Argument Sec. I.C. Because the requested injunction preserves the status quo and

prevents an irreversible breach before the Court can adjudicate the parties' rights, the equities decisively favor Tribl Music Group.

## IV. Granting Injunctive Relief Will Not Adversely Affect Public Policy or the Public Interest.

Granting injunctive relief here serves—rather than disserves—the public interest. Courts consistently recognize that the public interest is advanced by enforcing valid contractual obligations and holding parties to the bargains they freely struck. *See Charles Schwab & Co., Inc. v. McMurry*, No. 2:08-cv-534 (FTM), 2008 U.S. Dist. LEXIS 104140, at *10 (M.D. Fla. Dec. 23, 2008) ("The public interest is served by insuring that valid contractual provisions are enforced."); *Developers Sur. and Indem. Co. v. Bi-Tech Const., Inc.*, 964 F. Supp. 2d 1304, 1310 (S.D. Fla. 2013) ("[T]he requested injunction comports with the public interest in enforcing contracts…."). Granting injunctive relief here also serves the public interest by preserving the status quo and preventing irreversible contractual violations before the Court can adjudicate the parties' rights on the merits.

The injunction Tribl Music Group enforces existing contractual commitments and reinforces the broader policy favoring predictability and reliability in contractual relationships. Enjoining ongoing noncompliance preserves the contractual framework the parties agreed would govern their relationship and prevents erosion of bargained-for rights while this dispute is adjudicated. Far from harming the public interest, granting injunctive relief here confirms that the exclusivity and performance

- 19 -

obligations set forth in the Deal Memo at issue will be enforced according to their terms while this dispute is adjudicated.

## V.    The Requested Relief Is Narrowly Tailored To Preserve The Status Quo.

Tribl Music Group seeks narrow emergency relief directed to a specific imminent unauthorized planned release. The requested relief is limited to commercial distribution and delivery of those recordings and related metadata through non-TRIBL channels, and is designed to preserve the status quo and enforce the Deal Memo's exclusive rights pending a prompt preliminary-injunction hearing. Tribl Music Group does not seek to restrain Moore's future creative activity in the abstract; it seeks to prevent imminent and ongoing circumvention of the agreed release-control framework.

## <u>CONCLUSION</u>

For the foregoing reasons, Tribl Music Group's motion should be granted in its entirety, along with such other and further relief the Court deems just, proper, and equitable.

Respectfully Submitted,

REED SMITH LLP

/s/ *Adria Perez*
Adria Perez
Georgia Bar No. 141306
Reed Smith LLP
999 Peachtree Street NE
Suite 2500
Atlanta, Georgia 30339
(470) 947-5800

*Attorneys for Tribl Music Group, LLC*

# **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

This 27th day of January, 2026.

/s/ *Adria Perez*
Adria Perez

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of January, 2026, a copy of the foregoing

**COMPLAINT IN INTERVENTION BY TRIBL MUSIC GROUP, LLC** was

electronically filed with the Clerk of the United States District Court for the Northern

District of Georgia using the CM/ECF system, and that the same was served via the

CM/ECF system to counsel of record:

Anne H. Baroody
Promenade Tower
1230 Peachtree Street NE, 21st Floor
Atlanta, Georgia 30309
abaroody@bradley.com

Samuel D. Lipshie
Charles E. Elder
Dawn M. Jackson
1221 Broadway, Suite 2400
Nashville, TN 37203
slipshie@bradley.com
celder@bradley.com
djackson@bradley.com
*Counsel for Plaintiffs Chandler Moore and
MoWorks, LLC*

/s/ *Adria Perez*
Adria Perez