**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **CHANDLER MOORE** and **MOWORKS LLC**,          )<br>)<br>)<br>            Plaintiffs,     )<br>                                )<br>v.                              )<br>                                )<br>**NORMAN GYAMFI, INSIGNIA HOLDING COMPANY, INSIGNIA ASSETS, LLC, TRIBL PUBLISHING INC., TRIBL RECORDS, LLC, MAVERICK CITY MUSIC, INC.,** And **MAVERICK CITY MUSIC PUBLISHING, LLC**,     )<br>            Defendants.    )<br>_____ )<br>                                )<br>**MAVERICK CITY MUSIC, INC.** and **MAVERICK CITY PUBLISHING, LLC**,   )<br>                                )<br>            Counter-Plaintiffs,  )<br>                                )<br>v.                              )<br>                                )<br>**CHANDLER MOORE**,              )<br>                                )<br>            Counter-Defendant.  )<br>_____ )   | Case No. 1:25-cv-5635 |

| | |
|---|---|
| **TRIBL MUSIC GROUP, LLC,** | ) |
| | ) |
| Intervenor, | ) |
| | ) |
| v. | ) |
| | ) |
| **CHANDLER MOORE and** | ) |
| **MOWORKS LLC,** | ) |
| | ) |
| Counter-Defendants. | ) |
| | ) |

## DECLARATION OF ERIK J. GAINES

I, Erik J. Gaines, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am over 18 years of age and am competent to make this declaration.

2. I am the Chief Strategy Officer of Insignia Assets, LLC and, in that capacity, am an authorized representative of Tribl Music Group, LLC ("Tribl Music Group"). Insignia Assets, LLC is the sole member of Tribl Music Group. I make this declaration based on personal knowledge and review of records kept in the ordinary course of business.

3. Tribl Music Group brings this motion for a temporary restraining order and preliminary injunction to prevent the release by Plaintiffs, on or about January 30, 2026, of "God I'm Just Grateful." Based on information provided by a major streaming partner, the release of "God I'm Just Grateful" is imminent and is being planned for within digital service provider systems. Once Moore's recording is released to digital service providers, Tribl Music Group will be unable to recall or

meaningfully reverse the release, even if a court later determines that the release violated the Deal Memo.

4. Insignia Assets, LLC is a collaborative media and entertainment company in the Christian, gospel, and inspirational music industry.

5. Tribl Music Group is a successful and well-known music company that works with and produces some of the best musicians and content throughout the inspirational genre. Tribl Music Group is affiliated with and provides services to other music and publishing entities in the gospel and inspirational genre, including Tribl Records, LLC, Maverick City Music, LLC, and others.

6. Tribl Music Group and plaintiffs, MoWorks LLC f/s/o Chandler Moore ("MoWorks LLC") and Chandler Moore ("Moore" and with MoWorks, LLC, "Plaintiffs"), entered into a "Deal Memo," effective April 18, 2024. A true and correct copy of the Deal Memo is attached to Tribl Music Group's Complaint in Intervention as Exhibit A. The Deal Memo inadvertently omitted the "LLC" from the name of "TRIBL MUSIC GROUP" when listing the parties thereto. Nonetheless, at the time of signing, all parties understood TRIBL MUSIC GROUP to refer to "Tribl Music Group, LLC," as that was the sole entity operating by that name in connection with the subject matter of the Deal Memo.

7. Moore is a well-known artist and the former face of Tribl Music Group affiliate, Maverick City Music. In this capacity, Moore was the lead singer, main

songwriter, most recognizable member, and most prioritized. He was positioned by Tribl Music Group for key opportunities, including collaborations with well-known musicians like Justin Bieber, and promoted through global tours. Tribl Music Group invested millions of dollars into Moore's brand and career, as both a solo artist and a member of Maverick City Music, and paid Moore hundreds of thousands of dollars pursuant to the Deal Memo.

8. The Deal Memo refers to "TRIBL MUSIC GROUP" which means Tribl Music Group, LLC. There is no other entity known by this name and it does not refer to an affiliation or grouping of other unidentified entities.

9. Among other obligations, the Deal Memo provides that "Moore will render his exclusive personal services in connection with the recording of audio and audiovisual recordings containing Moore's performances, as well as live concert performance dates as specified herein." Ex. A at 1.

10. Additionally, under the Deal Memo, "[a]ll recordings will be owned by Moore and exclusively licensed to TRIBL until seven (7) years following the later of: (i) the end of the Term and (ii) recoupment." Ex. A at 3. The exclusive license continues and has not been terminated through either the end of the Term or recoupment.

11. Music licenses, like the license assigned in the Deal Memo, are fundamental to the entire recorded music industry, granting authority to negotiate

contracts, promote and sell albums, and negotiate radio and distribution rights, while providing a framework by which artists get paid.

12. On or about January 14, 2026, Tribl Music Group discovered Moore's plans to release a song he wrote and performed, entitled "God I'm Just Grateful," on or about January 30, 2026, outside Tribl Music Group's authorized distribution channels and without any label waiver or written consent. Tribl Music Group has not authorized, consented to, waived, or otherwise approved this release, or any related recordings or releases by Moore outside its contractual clearance process.

13. Unless restrained, release of Moore's unauthorized new music will cause immediate and irreparable harm to Tribl Music Group's exclusive rights, partner relationships, and release strategy.

14. The Deal Memo's exclusivity provision is an important right that protects Tribl Music Group's brand strategy, marketing, and impacts and impairs Tribl Music Group's relationships throughout the industry.

15. The harms from unauthorized distribution include loss of control over release timing and marketing, marketplace confusion, disruption to coordinated release strategy, and harm to Tribl Music Group's relationships with digital service providers ("DSP") and radio partners. These harms are not readily quantifiable and are difficult to undo once recordings and distributed.

16. Once a recording is distributed to digital service providers and radio partners, the label's control is effectively lost. Unauthorized releases cause marketplace confusion, disrupt coordinated release strategy, impair relationships with DSP and radio partners, and devalues exclusivity and licensed rights that are difficult if not impossible to unwind or fully compensate with money damages. For instance, an early or unauthorized release of one album may have impacts on other albums and artists released at or near the same time or may miss key industry milestones or dates as a result.

17. Tribl Music Group collaborates and contracts with DSPs, playlist editors, collaborators and other industry partners. Tribl Music Group's distribution relationships rely heavily on trust, predictability, and clear internal controls over releases. If an artist signed to Tribl Music Group bypasses the distribution pathway through Tribl Music Group to DSPs and other release platforms, it undermines the trust Tribl Music Group has cultivated and can create operational friction, disrupted pitching strategies, and administrative burdens for DSPs. This results in a loss of trust that causes reduced flexibility, slower responsiveness, or diminished willingness by Tribl Music Group's partners to invest resources or prioritize any Tribl Music Group future releases, including those for other innocent musicians.

18. Additionally, there is a meaningful risk that such conduct could negatively affect Tribl Music Group's reputation for professionalism and control in

the marketplace. Labels and distributors are not only judged on the quality of the musicians they represent but also on their ability to manage artists, enforce agreements, and deliver clean, coordinated rollouts. Repeated or unaddressed breaches (including unauthorized releases) could impair Tribl Music Group's credibility when negotiating future distribution arrangements, partnerships, or strategic opportunities, as counterparties may perceive heightened execution or compliance risk.

19. The goodwill risk is particularly high where the unauthorized release results in public takedowns of songs, catalog inconsistencies across DSPs, or confusion around representation. As Moore has been one of the most visible and successful artists signed to Tribl Music Group, other artists signed with Tribl Music Group may believe that they can breach their agreements and release their own music, as well, with little or no consequences, seeing this as an alternative to their contractual exclusivity provisions.

20. Further, third-party partners, including concert promoters, DSPs, event hosts, and marketing companies, may become reluctant to enter into or expand agreements if they believe that Tribl Music Group cannot ensure exclusivity, prevent circumvention, or maintain a unified release strategy across its roster. While a single incident may be manageable if resolved swiftly, failure to prevent future breaches

increases the likelihood of reputational erosion that affects future negotiations, leverage, and long-term strategic relationships.

21. As part of its role in publishing and contracting with musicians, Tribl Music Group operates a comprehensive planning schedule to maximize value for all interested parties and ensure successful launches of new music. Tribl Music Group's release schedule operates as an interdependent matrix, with each single and album planned in alignment with broader marketing strategies, financial projections, competitive release activity (both internal and external), and the long-term positioning of each artist's brand. Release dates are carefully coordinated in partnership with artists and their respective management teams, and shifting a single date often requires retooling weeks or months of surrounding releases.

22. There is limited inventory available for support on streaming platforms and Tribl Music Group strives to avoid releasing music between two competitive artists or genres on the same day as it could impede the ability of each to be successful. Additionally, in an online streaming environment momentum matters and social media activity, algorithmic lift, and timing all compound to drive the success of individual songs, albums, branding, and long-term platform visibility. Once that momentum is diverted or diluted, it cannot be recreated or repaired after the fact.

23. The unauthorized release of Moore's song would cause downstream effects that are not merely financial, but would influence other performers, campaigns, release dates, time, and cause confusion and business interruption.

24. Once dates are finalized, Tribl Music Group spends anywhere from several weeks to multiple months coordinating each release with its global distribution partner and DSPs. Tribl Music Group commits significant capital across digital advertising, on-platform promotion, influencer marketing, and related campaigns to support each release.

25. Additionally, consumer confusion is irreparable. Tribl Music Group is an important part of the gospel and inspirational music industry and the dissipation of its brand through performers performing and recording with other groups outside the authorized channels may result in confusion, diminution of brand value, and reputational harm that cannot be adequately compensated or calculated monetarily. Moore has been a well-recognized member of Maverick City Music and his release and competition with Maverick City Music performers risks dividing consumer purchasing, media attention, and confusing the public about members of Maverick City Music.

26. Under the Deal Memo, Moore was required to deliver one album comprised of at least ten newly mastered recordings featuring his primary performances. Moore did not do so. Moore delivered only seven newly mastered

recordings, and Tribl Music Group did not agree, in writing or otherwise, that this partial delivery satisfied or modified Moore's contractual Product Commitment.

27.    The only newly mastered recordings delivered by Moore to Tribl Music Group in purported satisfaction of his Product Commitment were the following seven songs: "I Have A Father," "Joy," "What I Needed," "All," "Great I Am," "Omemma," and "Lead Me On."

28.    Tribl Music Group has not issued any written waiver, carve-out, or authorization permitting the planned release of "God I'm Just Grateful," and no such waiver exists.

29.    Once Moore's recording is released to digital service providers, Tribl Music Group will be unable to recall or meaningfully reverse the release, even if a court later determines that the release violated the Deal Memo.

30.    Based on information provided by a major streaming partner, the release on or about January 30, 2026, of "God I'm Just Grateful" is imminent and is being planned for within digital service provider systems.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 27, 2026

_____
Erik J. Gaines