IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CHANDLER MOORE and<br>MOWORKS LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>NORMAN GYAMFI, INSIGNIA<br>HOLDING COMPANY, INSIGNIA<br>ASSETS, LLC, TRIBL<br>PUBLISHING INC., TRIBL<br>RECORDS, LLC, MAVERICK<br>CITY MUSIC, INC., and<br>MAVERICK CITY MUSIC<br>PUBLISHING LLC,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action File No. 1:25-CV-<br>05635-SEG |

**PLAINTIFF CHANDLER MOORE AND MOWORKS LLC'S
MEMORANDUM IN OPPOSITION TO TRIBL MUSIC GROUP, LLC'S
MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES......................................................................... iii

INTRODUCTION .................................................................................1

FACTUAL BACKGROUND ...................................................................3

LEGAL STANDARD ............................................................................7

ARGUMENT ........................................................................................8

I.    Tribl Music Group, LLC Has Failed to Establish Grounds for a Temporary
       Restraining Order.........................................................................8

       A.    Tribl Has Failed to Show a Likelihood of Success on the Merits of
              its Claim for Breach of Contract. .........................................8

       B.    Tribl Has Failed to Demonstrate a Likelihood of Irreparable Harm...14

       C.    The Harm to Moore Far Outweighs Any Potential Harm to Tribl......18

       D.    Injunctive Relief Will Adversely Affect Public Policy and Public
              Interest. .............................................................................20

       E.    A Bond Should Be Required Pursuant to Federal Rule of Civil
              Procedure 65........................................................................21

CONCLUSION ....................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AimPoint Re SA v. GCD & Associates, LLC*,
  2017 WL 7519193 (N.D.Ga., 2017) ................................................................16

*Am. Red Cross v. Palm Beach Blood Bank, Inc.*,
  143 F.3d 1407 (11th Cir.1998) .........................................................................7

*Amoco Production Co. v. Village of Gambell, AK*,
  480 U.S. 531 (1987) ........................................................................................18

*Baldwin v. Express Oil Change, LLC*,
  87 F.4th 1292 (11th Cir. 2023) .......................................................................19

*DonRob Investments, L.P. v. 360 Residential, LLC*,
  363 Ga. App. 312 (2022) ...................................................................................9

*Hull v. Spalding*,
  Civil No. 1:25-cv-01598-SEG, 2025 WL 2271995 (N.D. Ga. Apr.
  10, 2025) ..........................................................................................................14

*Huntley v. Chicago Bd. of Options Exch.*,
  No. 1:15-cv-1945, 2015 WL 12159219 (N.D. Ga. Aug. 4, 2015) ...................16

*Kirk v. First Georgia Inv. Corp.*,
  236 S.E.2d 254, 239 Ga. 171 (Ga. 1977)..........................................................9

*Liggins v. Parkwood Living, LLC*,
  907 S.E.2d 731 (Ga. App., 2024) ......................................................................9

*Lopez v. Garriga*,
  917 F.2d 63 (1st Cir. 1990)..............................................................................15

*Martin v. Crittenden*,
  347 F. Supp. 3d 1302 (N.D. Ga., 2018).............................................................7

*McAlister v. Clifton,*
  313 Ga. 737 (Ga., 2022) ..................................................................................9

*Morgan Stanley DW, Inc. v. Frisby,*
  163 F. Supp.2d 1371 (N.D. Ga., 2001)...........................................................17

*Roberts v. Barrett Daffin Frappier Turner & Engel, LLP,*
  1:24-cv-4682-SEG, 2024 WL 5710751 (N.D. Ga. Oct. 25, 2024) ...............8, 13

*Ruffin v. Great Dane Trailers,*
  969 F.2d 989 (11th Cir. 1992) .........................................................................15

*Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.,*
  320 F.3d 1205 (11th Cir. 2003) .........................................................................8

*Siegel v. LePore,*
  234 F.3d 1163 (11th Cir. 2000) .......................................................................14

*SME Racks, Inc. v. Sistemas Mecanicos Para, Electronica, S.A.,*
  243 Fed. Appx. 502, 2007 WL 1941976 (11th Cir. 2007) ...............................14

*Solomon v. PennyMac Loan Services, LLC,*
  2025 WL 3909354 (N.D. Ga., 2025) ................................................................21

*Suntrust Bank v. Houghton Mifflin Co.,*
  268 F.3d 1257 (11th Cir. 2001) .........................................................................7

*Tiber Laboratories, LLC v. Hawthorn Pharmaceuticals, Inc.,*
  527 F. Supp.2d 1373 (N.D. Ga., 2007)............................................................17

*Unisource Worldwide, Inc. v. South Central Alabama Supply, LLC,*
  199 F. Supp. 2d 1194 (M.D. Ala., 2001)..........................................................19

*United States v. Lambert,*
  695 F.2d 536 (11th Cir. 1983) ...........................................................................7

*Windsor v. United States,*
  379 Fed. App'x 912 (11th Cir. 2010)..................................................................8

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)............................................................................................7, 8

*Wreal, LLC v. Amazon.com, Inc.*,
  840 F.3d 1244 (11th Cir. 2016) ................................................................7

**Other Authorities**

Fed. R. Civ. P. 65 ..................................................................................3, 21

Fed. R. Civ. P. 65(c).................................................................................21

# INTRODUCTION

Tribl seeks an injunction to prevent Moore from "releasing, authorizing, or distributing any recordings by Moore," effectively blocking him from earning a living as a music artist indefinitely, despite the fact that Moore is no longer bound by the Deal Memo that Tribl seeks to enforce. On its face, the recording "Term" of the Deal Memo ended shortly after Moore recorded his first album under the Deal Memo. Moore has fully satisfied his recording obligations under the Deal Memo, newly recording eleven songs in May 2024, and Tribl conceded this fact when it paid Moore the final recording installment on July 22, 2024, shortly after he satisfied his recording obligations. Although the Deal Memo included an option to renew for another album, Tribl did not exercise it. Indeed, Tribl admits in its own Motion that Moore is the "former" face of Tribl's artist, Maverick City Music, and "was" a key artist in its stable. [Dkt. 46, p. 2; Dkt 46-1, ¶ 7]. Whether a deliberate admission or a telling Freudian slip, Tribl's repeated use of the past tense illustrates its current view that Moore is no longer one of its artists.

Nor does Tribl contend that the song it immediately seeks to enjoin, entitled "God I'm Just Grateful," scheduled for release on February 6, is one of the eleven songs on the album that Moore delivered pursuant to the Deal Memo. (It is not.) In short, neither the specific song at issue in the Motion nor Moore's future music

recordings generally are subject to the Deal Memo at all.  In any event, Tribl could not enforce that Deal Memo because, as detailed in Moore's Complaint and in the declarations submitted herewith, Tribl is in breach of its own obligations in the Deal Memo, including by improperly cross collateralizing Moore's royalties, improperly retaining Moore's publishing royalties and monies, failing to pay monies owed to Moore for the Kingdom World Tour/Good News Tour, and failing to pay Moore the final publishing advance in the amount of $125,000.00.  [Declaration of Markel Ringer, ¶¶ 7-8, 10-11, 13-18, and 22].  As such, Tribl fails to establish a likelihood of success on the merits.

Tribl also fails to demonstrate any threat of irreparable harm.  As noted above, Tribl expressly characterizes Moore as a "former" artist who "was," but no longer is, "prioritized" at the label.  Tribl submits the declaration of a Tribl executive who, in an effort to support the assertion of irreparable harm, makes vague and indecipherable references to an "interdependent matrix" of "marketing strategies, financial projections, and competitive release activity."  [Dkt 46-1, ¶ 21].  Yet Tribl never claims that it has any plans to release anything featuring Moore ever, let alone explain how the release of "God I'm Just Grateful" would disrupt any of those (nonexistent) plans.  Further, Tribl waited two weeks after learning of the planned

release of "God I'm Just Grateful" before filing the Motion, which undermines any inference that this is an emergency or that the harm would truly be irreparable.

The balancing of public and private equities also strongly favors Moore here. Tribl seeks to deprive Moore of his livelihood by forbidding him from releasing any new music, notwithstanding that Tribl has zero future plans to release any of his music. Not only would that irreparably damage Moore's music career, it would deprive fans of Moore and Christian music of new music. The injury to Moore would be so significant that the bond required by Federal Rule of Civil Procedure 65 must, if the Court enters any injunction, reflect the potential complete destruction of an artist's career—which is just what Tribl and its alter ego, Norman Gyamfi, plainly seeks.

## **FACTUAL BACKGROUND**

The first paragraph of the Deal Memo specifies that the terms of the Deal Memo are "with respect to Moore's personal services and the services of TRIBL in connection with the production and commercial exploitation of audio and audiovisual recordings, records, songs, touring activities, and other materials **described in this Deal Memo**." [Declaration of Chandler Moore, Ex. A]. There is nothing in the Deal Memo to suggest that records other than those provided in accordance with the Term/Product Commitment section will be governed by the

3

Deal Memo, which required Moore to record "[o]ne album comprised of at-least ten (10) newly recorded master recordings." [Moore Decl., Ex. A – Term/Product Commitment].  The "Term" of the Deal Memo extends only "until 9 months following release of the initial period album." [*Id.*]  Solely with respect to the songs recorded pursuant to the Deal Memo, the Ownership/License Term section of the Deal Memo states that "[a]ll recordings will be owned by Moore and exclusively licensed to TRIBL until seven (7) years following the later of: (i) the end of the Term and (ii) recoupment." [Moore Decl., Ex. A – Ownership/License Term].

Moore has fulfilled his obligations under the Deal Memo. [Ringer Decl., ¶¶ 5-12; Moore Decl., ¶¶ 8-15].  The Deal Memo required Moore to record one album of ten (10) songs. [Ringer Decl., ¶ 4; Moore Decl., Ex. A – Term/Product Commitment].  Moore recorded the following eleven songs for the live album, *Chandler Moore: Live in Los Angeles* (the "Album"), in satisfaction of his recording obligations under the Deal Memo:

1. Patient

2. If It's You

3. Hand of God

4. Joy

5. Lead Me On

     6.  Great I Am

     7.  All

     8.  While My Light Is On

     9.  OMEMMA

     10.I Have a Father

     11.What I Needed

[Moore Decl., ¶ 8; Ringer Decl., ¶ 5].

As released, the Album only consisted of seven songs because Tribl wanted to release a deluxe version of the Album that would include Moore's studio master recordings. [Moore Decl., ¶ 11; Ringer Decl., ¶ 5]. Moore gave Tribl authority to use the following studio recordings for the deluxe version of the Album and made himself available to serve as an executive producer on Maverick City Records:

     1.  While My Light Is On

     2.  If It's You

     3.  Hand of God

[Moore Decl., ¶ 12]. Tribl released the Album on August 2, 2024. [Ringer Decl., ¶ 5]. Moore recorded the studio master recordings in a studio of Tribl's choosing, Record Plant, in Los Angeles. [Moore Decl., ¶ 11]. The studio master recordings are in Tribl's possession. [Moore Decl., ¶ 13]. Due to Tribl's own issues,

unrelated to Moore, obtaining their files for those studio master recordings to use in the deluxe version of the Album, no deluxe version of the Album was ever released. [Moore Decl. ¶ 13; Ringer Decl. ¶ 6].

Tribl submits with its Motion the declaration of an executive, EJ Gaines, who now claims that Tribl ultimately received only seven of those ten songs. [Dkt. 46-1, ¶ 27]. Yet Mr. Gaines fails to inform the Court that Moore recorded eleven songs for the live album, and it was Tribl's decision to only use seven of those songs for the Album that was ultimately released. [Moore Decl. ¶¶ 8-11; Ringer Decl. ¶ 5]. Nor did Gaines inform the Court that Tribl's failure to release the deluxe version of the Album was due to Tribl's issues accessing their own files for the studio master recordings. [Moore Decl. ¶¶ 11-13; Ringer Decl. ¶ 6]. That is not Moore's responsibility. Nothing in the Deal Memo even empowers, let alone obligates, Moore to take physical possession of the master recordings and personally "deliver" them to Tribl. [Dkt. 46-1, ¶ 26]. Moore has fully satisfied his obligations under the Deal Memo. [Moore Decl. ¶¶ 8-15; Ringer Decl. ¶¶ 4-12].

The original record of "God I'm Just Grateful" was released by Elevation Worship in November 2025 and was not recorded nor released subject to the Deal Memo. [Ringer Decl., ¶ 24]. Moore's recording of "God I'm Just Grateful" (the "Single") which Tribl incorrectly alleges will be released on Friday, January 30,

6

2026, is also not subject to the Deal Memo.  [Dkt. 46, P. 7; Dkt. 44-2, ¶ 3; Ringer Decl., ¶ 24].

## LEGAL STANDARD

Preliminary injunctive relief is an "extraordinary remedy that may only be awarded upon a ***clear showing*** that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis added).  A movant is "not entitled to relief in the form of a preliminary injunction unless it has prove[n] each of the following four elements: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction were not granted, (3) that the threatened injury to the plaintiff outweighs the harm an injunction may cause the defendant, and (4) that granting the injunction would not disserve the public interest.  *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001) (citing *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir.1998)).  "A preliminary injunction is an extraordinary and drastic remedy," and the movant carries the significant burden of persuasion to clearly establish all four of the prerequisites.  *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016).  "Because a preliminary injunction is an extraordinary and drastic remedy, its grant is the exception rather than the rule[.]"  *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983).

"The standard for obtaining a temporary restraining order [] is identical to that of obtaining a preliminary injunction." *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308 (N.D. Ga., 2018) (citing *Windsor v. United States*, 379 Fed. App'x 912, 916-17 (11th Cir. 2010)). Accordingly, to obtain the TRO it seeks, Tribl bears the burden of proving that it satisfies each of the four *Winter* prerequisites: (1) likelihood of success on the merits, (2) irreparable harm, (3) balance of equities favoring relief, and (4) public interest. *See Winter*, 555 U.S. at 20; *see also Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003).

## ARGUMENT

### I.   Tribl Music Group, LLC Has Failed to Establish Grounds for a Temporary Restraining Order.

For the reasons set forth below, Tribl falls short of making the required "clear showing" that it is entitled to injunctive relief. *Winter*, 555 U.S. at 22.

### A.   Tribl Has Failed to Show a Likelihood of Success on the Merits of its Claim for Breach of Contract.

"Likelihood of success on the merits is 'generally the most important element' of the preliminary injunction standard." *Roberts v. Barrett Daffin Frappier Turner & Engel, LLP*, 1:24-cv-4682-SEG, 2024 WL 5710751, at *1 (N.D. Ga. Oct. 25, 2024). Tribl has failed to establish a likelihood of success on the merits of its breach of contract claim because it has (1) failed to prove that it has substantially performed

its obligations under the Deal Memo and (2) failed to prove that Moore breached his obligations under the Deal Memo.

To prevail on a claim for breach of contract, Tribl must prove (1) that there was a breach; (2) that there were resultant damages; and (3) that it is the party who has the right to complain about the contract being broken. *See McAlister v. Clifton*, 313 Ga. 737, 743 (Ga., 2022). A breach occurs if "a contracting party repudiates or renounces liability under the contract; fails to perform the engagement as specified in the contract; or does some act that renders performance impossible." *Liggins v. Parkwood Living, LLC*, 907 S.E.2d 731, 736 (Ga. App., 2024). Further, "a party seeking specific performance of a contract must show substantial compliance with his part of the agreement in order to be entitled to a decree." *DonRob Investments, L.P. v. 360 Residential, LLC*, 363 Ga. App. 312, 320 (2022) (citing *Kirk v. First Georgia Inv. Corp.*, 236 S.E.2d 254, 256, 239 Ga. 171, 172 (Ga. 1977)).

### 1. Moore Fully Performed the Deal Memo, So Tribl Cannot Clearly Show that He Breached the Deal Memo.

Tribl alleges that "by writing, recording, and releasing Compositions without authorization" and thereby, "depriving Tribl Music Group of its exclusive license to the Compositions[,]" Moore has breached the Deal Memo. [Dkt. 46, P. 7]. Moore has already fully performed his recording obligations under the Deal Memo, and Tribl waived any argument to allege otherwise once they paid Moore for "delivery

9

of the recording commitment for the Term." [Moore Decl. – Ex. A – Deal Memo, Recording Fund/Artist Advance; Moore Decl., ¶¶ 8-10; Ringer Decl., ¶¶ 5-8].

The Deal Memo required Moore to (1) record one album of at least ten (10) newly recorded master recordings; (2) commit to performing in a series of forty (40) concert-tour dates by December 21, 2024; and (3) provide at least twelve (12) compositions. [Moore Decl. – Ex. A - Deal Memo, Term/Product Commitment, Touring, Music Publishing - (ix) Minimum Delivery/Release Requirement]. In satisfaction of his recording obligations, Moore recorded eleven songs for the live album, *Chandler Moore: Live in Los Angeles* (the "Album"). [Moore Decl., ¶ 8; Ringer Decl., ¶ 5]. In satisfaction of his publishing requirements, Moore provided original musical compositions. [Moore Decl., ¶ 14; Ringer Decl., ¶ 12]. In satisfaction of his touring obligations, Moore committed to perform in the Kingdom World Tour and the Good News Tour, which were scheduled for a total of 40 shows. [Moore Decl., ¶ 15; Ringer Decl., ¶ 9]. During the Kingdom World Tour, however, Tribl unilaterally cancelled the last six (6) shows, and they never rescheduled those performances. [Moore Decl., ¶ 15; Ringer Decl., ¶ 9]. Moore performed the other 34 shows as agreed. [Moore Decl., ¶ 15; Ringer Decl., ¶ 9].

To the extent Tribl claims that an album of only seven recordings was released, that was due to Tribl's own decision not to release all eleven of the master

recordings recorded by Moore. [Moore Decl., ¶ 11; Ringer Decl., ¶ 5]. Moore more than fulfilled his requirement to record ten "newly recorded master recordings" which Tribl conceded when they paid him following the recording of the Album. [Moore Decl., ¶¶ 8-10; Ringer Decl., ¶¶ 5-8]. Following the execution of the Deal Memo, on May 6, 2024, Tribl paid Moore the $300,000.00 recording advance and the first $125,000.00 payment for initial recording costs. [Moore Decl., ¶¶ 8-10; Ringer Decl., ¶¶ 5-8]. Moore recorded the Album in May 2024, in satisfaction of his recording obligations under the Deal Memo. On July 22, 2024, Tribl paid Moore the second $125,000.00 owed under the terms of the Deal Memo, which was only to be paid upon "delivery of the recording commitment for the Term." [Moore Decl. – Ex. A – Recording Fund/Artist Advance; Moore Decl., ¶¶ 8-10; Ringer Decl., ¶¶ 5-8]. Accordingly, Tribl has waived any argument to state that Moore has not satisfied his recording obligations under the Deal Memo when it paid him the final $125,000.00 recording payment shortly after he fulfilled his recording obligations. [Moore Decl., ¶¶ 8-10; Ringer Decl., ¶¶ 5-8].

Further, since the Deal Memo only governs the records contemplated therein—the ten-song commitment—Tribl does not have an "exclusive license" to distribute the Single, which was created independent of Moore's recording requirement under the Deal Memo, or any other records or compositions not

contemplated by the Deal Memo. [Ringer Decl., ¶ 24]. Tribl, therefore, has not proven that a breach of the Deal Memo occurred. On the contrary, Moore has fulfilled his recording obligations under the Deal Memo.

Granting the Motion would summarily determine one of the central issues in this dispute without the necessary aid of discovery—whether each party to the Deal Memo performed its obligations as required therein. Accordingly, if the Motion is granted, this would deny Moore the opportunity to prove the allegations in the Complaint while accepting Tribl's allegations as fact before meaningful discovery has even occurred.

There is also a serious dispute as to the counterparty to the Deal Memo. As evidenced by the Deal Memo and in the Declaration of Markel Ringer submitted herewith, there is no clear indication as to which of Gyamfi's myriad of companies is the actual party to the Deal Memo. [Ringer Decl., ¶ 26; Moore Decl., Ex. A]. Further, the entity that Tribl is now alleging is the appropriate entity, Tribl Music Group, LLC is not referenced a single time in the Deal Memo. [Moore Decl., Ex. A]. The convenient excuse that this is a typographical error is insufficient to prove that Tribl is the appropriate party to assert the breach of contract claim against Moore. Tribl, therefore, has failed to prove that they are likely to succeed on the merits of their breach of contract claim.

### 2. Tribl Has Failed to Substantially Perform Its Obligations Under the Deal Memo.

As alleged by the Complaint and evidenced in the Declarations of Chandler Moore, Markel Ringer, and Kevin Kookogey submitted herewith, Tribl has failed to perform its obligations under the Deal Memo by (1) failing to pay Moore the second publishing advance [Moore Decl., ¶ 4; Ringer Decl., ¶ 14]; (2) failing to pay Moore publishing royalties [Moore Decl., ¶ 4; Ringer Decl., ¶ 14]; (3) failing to produce accurate and timely accountings to Moore [Kookogey Decl., ¶¶ 3-5; Ringer Decl., ¶ 16]; (4) failing to pay Moore his share of all net profits from Moore's recordings after recoupment [Ringer Decl., ¶¶ 15 and 22; Ringer Decl., Ex. B]; (5) cross collateralizing Moore's royalties [Kookogey Decl., ¶ 3; Ringer Decl., ¶¶ 16 and 22; Ringer Decl. – Ex. B]; and (6) wrongfully retaining more than $800,000.00 owed to Moore, among innumerable other acts of breach.  [Dkt. 1; Ringer Decl., ¶ 14; Kookogey Decl., ¶¶ 3-5].

In its Motion, Tribl presents no evidence contradicting Moore's allegations regarding the multiple breaches of the Deal Memo.  Indeed, Tribl has not even denied those allegations.  In light of the evidence supporting Moore's allegations of those breaches, Tribl has fallen far short of demonstrating a likelihood of success on the merits of its breach of contract claim, and therefore, the TRO must be denied. *See Roberts*, 2024 WL 5710751, at *3 ("Because Plaintiffs have failed to

demonstrate a substantial likelihood that they will succeed on the merits of any claim, the motion for TRO fails"); *Hull v. Spalding*, Civil No. 1:25-cv-01598-SEG, 2025 WL 2271995, at *4 (N.D. Ga. Apr. 10, 2025) ("Because Plaintiff has failed to demonstrate a substantial likelihood that he will succeed on the merits of any claim, the motion for a TRO cannot succeed").

### B.    Tribl Has Failed to Demonstrate a Likelihood of Irreparable Harm.

Tribl fails to prove that there is a likelihood of irreparable harm because it has not produced any evidence of specific harms that would occur.  Tribl submits a declaration containing only conclusory assertions that the "release of Moore's unauthorized new music will cause immediate and irreparable harm to Tribl Music Group's exclusive rights, partner relationships, and release strategy" but fails to support these conclusory assertions with any concrete facts. [Dkt. 46-1, ¶ 13]. Declarant EJ Gaines merely provides musings on the value of exclusivity provisions and theoretical harms that could occur.  [Dkt. 46-1, ¶¶ 13-15].

To warrant an injunction, the irreparable injury complained of "must be neither remote nor speculative, but actual and imminent[,]" and "prospective harm, by itself, clearly does not meet the test of imminence." *SME Racks, Inc. v. Sistemas Mecanicos Para, Electronica, S.A.*, 243 Fed. Appx. 502, 504, 2007 WL 1941976, at *2 (11th Cir. 2007) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).

Therefore, "[a]n injunction is inappropriate if the possibility of future harm to the plaintiff arising out of the behavior plaintiff seeks to enjoin is purely speculative." *Ruffin v. Great Dane Trailers*, 969 F.2d 989, 995 (11th Cir. 1992) (citing *Lopez v. Garriga*, 917 F.2d 63, 67 (1st Cir. 1990)).

Gaines' broad generalizations about how Moore's alleged actions could affect Tribl's "brand strategy, marketing, and … relationships throughout the industry" is speculative and insufficient to prove irreparable harm.  [Dkt. 46-1, ¶ 14]. Gaines speaks of generic harms for a not insignificant eleven pages, but not once does he reference any planned releases that would be harmed by the release of the Single.

In fact, Gaines does not reference any current plans that Tribl has made to release any music with Moore nor how the release of the Single would harm any such plans.  That is because Moore is no longer its artist, which Tribl implicitly concedes by noting Moore's status as the "former face" of Maverick City Music and that Moore "**was** positioned by Tribl Music Group for key opportunities[.]"  [Dkt. 46-1, ¶ 7].

The release of the Single poses no current, let alone "immediate," risk of irreparable harm to Tribl because Tribl identifies no marketing strategy or general release plans for Moore's music that could be harmed by the release of the Single. [Dkt. 46-1, ¶ 16].  Tribl expressly concedes that it waited two weeks after learning

15

of the release of the Single before filing the Motion, severely undermining any inference that this is an emergency and that any harm would truly be irreparable. [Dkt. 46, p. 7; Dkt. 46-1, ¶ 12].  To the extent a fact finder could conclude that reputational harm could come to Tribl as a result of Moore's release of new music, the possibility of that future harm is speculative, at best.  Any alleged injuries in this case that are not broad and generic "can be addressed at trial[,]" and, therefore, "[i]mmediate injunctive relief is legally not available under these circumstances." *AimPoint Re SA v. GCD & Associates, LLC*, 2017 WL 7519193, at *4 (N.D.Ga., 2017) (quoting *Huntley v. Chicago Bd. of Options Exch.*, No. 1:15-cv-1945, 2015 WL 12159219, at *1 (N.D. Ga. Aug. 4, 2015)).

In addition, Tribl's claim that it is seeking this TRO to prevent the loss of goodwill, customers, and control over contractual rights is belied by the fact that Tribl is actively damaging its own goodwill, depriving itself of customers, and breaching the Deal Memo by its own conduct.  Specifically, Tribl has removed any mention of Moore on Spotify as a co-primary artist on all Maverick City songs to which he has contributed, which significantly damages his streaming numbers as an artist and ultimately has a negative effect on his value in the marketplace.  [Moore Decl., ¶ 16; Ringer Decl., ¶ 23].  Moore has contributed to almost all of Maverick City Music's biggest songs, and by retroactively removing his name as a co-primary

artist, Tribl is not only depriving itself of any goodwill associated with Chandler but also acting against its own stated pecuniary interests and causing consumer confusion. The fact that Tribl is vindictively removing Moore's credits on the recordings it has already released and publicly disassociating itself from Moore undermines its argument that it would be injured in its reputation or otherwise if Moore releases new music independent of his past association with Tribl.

In *Morgan Stanley DW, Inc. v. Frisby*, the Court held that equity estopped Morgan Stanley from alleging that its former employees breached their noncompete agreements by doing the exact same thing that Morgan Stanley encourages its new hires to do—"use their client information to solicit account transfers." *Morgan Stanley*, 163 F. Supp.2d 1371, 1377 (N.D. Ga., 2001). Analogously, Tribl should be estopped from claiming that the independent release and distribution of the Single will result in the loss of goodwill associated with Tribl and cause consumer confusion while it is simultaneously stripping itself of any goodwill associated with its affiliations with Moore and causing consumer confusion by removing any reference to Moore and his contributions to Maverick City Music's existing catalog on streaming platforms.

For these reasons, Tribl has failed to prove that there is a likelihood of irreparable harm if the Single is released, and, therefore, the TRO must be denied.

*Tiber Laboratories, LLC v. Hawthorn Pharmaceuticals, Inc.*, 527 F. Supp.2d 1373, 1382 (N.D. Ga., 2007) (noting that "failure to demonstrate irreparable injury alone precludes an award of preliminary injunctive relief").

### C. The Harm to Moore Far Outweighs Any Potential Harm to Tribl.

With regard to claims for injunctive relief, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987). In contrast to Tribl's failure to show a likelihood of irreparable harm absent injunctive relief, Moore submits herewith several declarations detailing the concrete and irreparable harms that would befall Moore if the Motion or preliminary injunction were to be granted. [Moore Decl., ¶¶ 17-19; Ringer Decl., ¶¶ 23 and 25]. Moore has been releasing music and developing his career as a singer, songwriter, and worship leader since 2014. [Moore Decl., ¶ 2]. Moore's primary source of income is publishing. [Moore Decl., ¶ 3].

Tribl has made no indication that it intends to market or release any new music by Moore, and that is because Moore is no longer affiliated with it. Gaines implicitly concedes this fact in his declaration wherein he notes that Moore is the "former face" of Maverick City Music and that he "**was** the lead singer, main songwriter, most recognizable member, and most prioritized" and that Moore "**was** positioned by

18

Tribl Music Group for key opportunities[.]"   [Dkt. 46-1, ¶ 7].   Tribl no longer considers Moore to be its artist.  [Dkt. 46, P. 8].

If the Court were to issue an injunction against Moore, and given that Tribl has no definitive plans to record, distribute, or release any of his music, then the injunction would place an indefinite hold on Moore's ability not only to make and release music, but also to maintain his career and provide for his family. [Moore Decl., ¶¶ 5 and 16-19].  Courts have often held that where injunctive relief would significantly harm one's ability to do business, the balance of harms weighs in that person's favor, especially where there is a significant disparity between the size of the parties.  *See Unisource Worldwide, Inc. v. South Central Alabama Supply, LLC*, 199 F. Supp. 2d 1194, 1214 (M.D. Ala., 2001); *see also Baldwin v. Express Oil Change, LLC*, 87 F.4th 1292, 1311 (11th Cir. 2023).  The harm to Moore of not being able to release new music and earn a living during the pendency of this litigation substantially outweighs any alleged harm to Tribl.  Tribl can release other music.  They can sign other artists, and they are already reaping an unwarranted windfall by retaining all of Moore's publishing royalties for his prior catalog pending resolution of this lawsuit. [Dkt. 1; Moore Decl., ¶¶ 5 and 17-19; Ringer Decl., ¶¶ 14 and 25].

19

Moore, on the other hand, would be impeded from working based on Tribl's allegations that he has not fulfilled his obligations under the Deal Memo. [Moore Decl., ¶¶ 18-19]. Tribl has not proven that any irreparable harm will ensue, and the theoretical harms that they allege do not outweigh the very tangible harms that Moore stands to experience. [Moore Decl., ¶¶ 18-19]. The only "emergency" is to Moore, to prevent Tribl from interfering with his right to contract.

### D. Injunctive Relief Will Adversely Affect Public Policy and Public Interest.

Granting injunctive relief to enforce Tribl's interpretation of the Deal Memo would be contrary to public policy. First, although Tribl argues that there is a public policy interest in enforcing contracts, that policy does not extend to situations such as this, where one party seeks to unilaterally extend its control of an artist beyond the stated terms of the contract. Second, the economic purpose of recording contracts generally is to increase the amount of music in the world. The remedy that Tribl seeks results in less music, not more: Tribl plainly has no intent to ever release new music from Moore again, and it seeks to block Moore from releasing new music in the future. The public interest favors more music released for public consumption ("output" in economic terms), not less.

Granting injunctive relief here would not confirm the terms of the Deal Memo but would rather reinforce Tribl's vindictive and oppressive tactics to kill Moore's

career and block any additional new music from Moore.  Public policy does not

support a grant of injunctive relief to reinforce such a grossly unreasonable outcome.

### E.    A Bond Should Be Required Pursuant to Federal Rule of Civil Procedure 65.

If the Court were inclined to enjoin, even temporarily, Moore from releasing

any new music (including "God I'm Just Grateful" on February 6), the Court should

order Tribl to post a substantial bond as required by the federal rules, given the

serious risk to Moore's career and livelihood.  [Moore Decl., ¶¶ 5 and 16-19; Ringer

Decl., ¶ 25].  Pursuant to Federal Rule of Civil Procedure 65(c), a court "may issue

a preliminary injunction or a temporary restraining order only if the movant gives

security in an amount that the court considers proper to pay the costs and damages

sustained by any party found to have been wrongfully enjoined or restrained."  Fed.

R. Civ. P. 65(c).  To waive or set a nominal bond as was requested by Tribl in this

Motion would be inequitable.  [Dkt. 45].

Through the Motion, Tribl seeks to enjoin Moore from not only releasing the

Single but also inhibit his ability to create and release new music for the pendency

of this litigation.  This would not only cause Moore unquantifiable financial harm

but would also damage his long term career.  [Moore Decl., ¶¶ 5 and 16-19; Ringer

Decl., ¶ 25].  Such an injunction warrants a meaningful bond.  *See Solomon v.*
*PennyMac Loan Services, LLC*, 2025 WL 3909354 at *1 (N.D. Ga., 2025) (stating

that "the purpose of a bond is to provide security to the enjoined party in the event that the injunction was wrongly issued.").

As Tribl concedes, Moore "was" the face of Maverick City Music and its "most recognizable member." [Dkt. 46, P. 2; Dkt. 46-1, ¶ 7]. The injunction Tribl seeks would significantly decrease Moore's publishing monies, royalties, and monies from live shows. [Moore Decl., ¶¶ 5 and 16-19; Ringer Decl., ¶ 25]. By enjoining Moore from releasing music for the entirety of this litigation, which could realistically last more than a year, Moore stands to incur at least a $2,500,000.00 decrease in his annual income, as well as potentially irreparable damage to his long term career. [Moore Decl., ¶¶ 5 and 16-19; Ringer Decl., ¶ 25]. Compensation for one year of losses would not be sufficient to secure Moore against the unquantifiable financial harm and the indefiniteness of the long term effects an injunction would have on his career. [Moore Decl., ¶¶ 5 and 16-19; Ringer Decl., ¶ 25]. Accordingly, to enjoin Moore from releasing music temporarily, or otherwise, Tribl should be required to pay a bond in the amount of $10,000,000.00.

## CONCLUSION

For the above stated reasons, Moore respectfully submits that Tribl's Motion for a Temporary Restraining Order and Preliminary Injunction should be denied.

DATE: February 3, 2026

Respectfully submitted,


BRADLEY ARANT BOULT CUMMINGS, LLP

/s/ *Anne H. Baroody*

Anne H. Baroody
Georgia Bar No. 475569
Promenade Tower
1230 Peachtree Street NE, 21st Floor
Atlanta, Georgia 30309
Tel: 404-868-2100
Fax: 404-522-8409
abaroody@bradley.com

Samuel D. Lipshie
Charles E. Elder
Dawn M. Jackson
1221 Broadway, Suite 2400
Nashville, TN 37203
Tel: 615-244-2582
Fax: 615-252-6380
slipshie@bradley.com
celder@bradley.com
djackson@bradley.com

*Counsel for Plaintiffs Chandler Moore and
MoWorks, LLC*

## <u>CERTIFICATION OF COMPLIANCE</u>

I hereby certify that the foregoing document has been prepared in 14-point

Times New Roman font and complies with LR 5.1(B).

This 3rd day of February, 2026.

/s/ *Anne H. Baroody*
Anne H. Baroody
Georgia Bar No. 475569

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of February, 2026, I have electronically filed with the Clerk of the United States District Court for the Northern District of Georgia and served via the CM/ECF system a copy of the foregoing **MEMORANDUM IN OPPOSITION TO TRIBL MUSIC GROUP, LLC'S MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER** to the following attorneys of record:

Adria Perez
London England
REED SMITH LLP
999 Peachtree Street NE
Suite 2500
Atlanta, Georgia 30339
aperez@reedsmith.com

Alyssa Florence Conn
Steven Cooper
REED SMITH LLP
599 Lexington Avenue, 22nd Floor
New York, New York 10022
aconn@reedsmith.com
scooper@reedsmith.com
*Attorney for Defendants*

This 3rd day of February, 2026.

By: /s/ Anne H. Baroody