IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| **CHANDLER MOORE and MOWORKS LLC,** | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| **NORMAN GYAMFI, INSIGNIA HOLDING COMPANY, INSIGNIA ASSETS, LLC, TRIBL PUBLISHING INC., TRIBL RECORDS, LLC, MAVERICK CITY MUSIC, INC., and MAVERICK CITY MUSIC PUBLISHING LLC,** | ) ) ) ) ) ) ) ) ) ) | Civil Action File No. 1:25-CV-05635-SEG |
| Defendants. | ) | |

## DECLARATION OF CHANDLER MOORE

I, Chandler Moore, pursuant to 28 U.S.C. § 1746 and in support of Plaintiffs' Memorandum in Opposition to the Motion for a Temporary Restraining Order and Preliminary Injunction (the "Response"), declare as follows:

1. I am a plaintiff in this lawsuit and the sole member of plaintiff MoWorks LLC. Unless expressly stated otherwise, I have personal knowledge of the facts contained herein.

2. I am a singer, songwriter, worship leader, and a former member of Maverick City Music. I have been releasing music since 2014.

3. Publishing monies have been my primary source of income throughout my career.

4. Since at least 2023, I have not received any publishing royalties or monies from Tribl Music Group ("Tribl") nor any of the Defendants named in this matter ("Gyamfi Defendants").

5. Tribl's wrongful retention of my publishing monies has severely limited my ability to provide a stable income for myself and my family and has negatively affected my mental, emotional, and physical wellbeing.

6. For years, I have made good faith attempts to resolve the ongoing issues I have been experiencing with Tribl and the Gyamfi Defendants without success. After discovering that my name was forged onto a publishing agreement with the Gyamfi Defendants, I was prepared to part ways with the Gyamfi Defendants and seek legal action.

7. However, in an attempt to end the relationship on amicable terms, I entered into an agreement for the creation of a specific set of compositions and recordings. We negotiated the terms of this final agreement and memorialized those terms in a written agreement on April 24, 2024, entitled the Deal Memo. To the extent that Tribl now claims that an entity called "Tribl Music Group, LLC" was a

2

party to the Deal Memo, I was never aware of the existence of any such entity. A true and accurate copy of the Deal Memo is attached hereto as **Exhibit A**.

8. In May 2024, I recorded the following eleven songs for the live album, Chandler Moore: Live in Los Angeles (the "Album"), in satisfaction of my recording obligations under the Deal Memo:

- Patient

- If It's You

- Hand of God

- Joy

- Lead Me On

- Great I Am

- All

- While My Light Is On

- OMEMMA

- I Have a Father

- What I Needed

9. In connection with my recording obligations, the Deal Memo requires Tribl to pay me (1) $300,000.00 upon execution of the Deal Memo; (2) $125,000.00 upon execution of the Deal Memo towards the administration of recording costs; and (3) $125,000.00 following delivery of the recording commitment.

10. All three payments have been made. Tribl paid me the $300,000.00 advance and the first $125,000.00 payment on May 6, 2024. Following the recording of the Album in May, Tribl paid me the second $125,000.00 on July 22, 2024 for the delivery of the recording commitment under the Deal Memo.

11. As released, the Album only consisted of seven songs because, according to Tribl, it wanted to release a deluxe version of the Album, including studio recordings that I had recorded with Tribl. We therefore agreed beforehand that I would allow Tribl to release a deluxe version of the Album as it wished. I also agreed to make myself available to serve as an executive producer on a number of Maverick City records, which I did.

12. In addition to the eleven songs recorded for the Album pursuant to the Deal Memo, I also gave Tribl authority to release the following studio master recordings in a deluxe version of the Album:

- While My Light Is On

- If It's You

- Hand of God

13. I recorded the songs referenced above in a studio of Tribl's choosing, Record Plant. It is my understanding that these master recordings are in Tribl's possession. Tribl, however, was unable to access the files for those studio recordings to use in the deluxe version of the Album. Due to Tribl's inability to obtain their files for the master recordings of the studio records, no deluxe version of the Album was ever released.

14. I also provided to Tribl original musical compositions (songs) in satisfaction of my publishing requirements under the Deal Memo.

15. During the term of the Deal Memo, I committed to perform in the Kingdom World Tour and the Good News Tour, in satisfaction of my touring obligations under the Deal Memo. I performed in the ten (10) Kingdom World Tour shows. The Good News Tour was scheduled for 30 shows. During the tour, Tribl unilaterally cancelled the last six (6) shows and never rescheduled those performances.

16. Since the filing of this lawsuit, Tribl has removed me as a co-primary performer on all Maverick City Music songs to which I have contributed on Spotify. This not only reduces my visibility on the streaming platform, but it will also have a negative effect on the momentum of my career.

17. As a result of the wrongful retention of my publishing monies, I have had to unenroll my two youngest children from school for a significant amount of time and, ultimately, resort to seeking additional forms of income through one-off shows, excessive touring, business loans, and seeking staff positions at churches which has required taking additional time away from my family. The excessive touring has become a necessity to maintain my livelihood and to for provide my family of six. The stress and lifestyle change that I have had to resort to has damaged my family's financial health, the stability of my business, and my mental, emotional, and physical wellbeing.

18. In addition to the harm that I am already experiencing due to Tribl's wrongful conduct, the requested injunction would effectively prevent me from releasing music during the life of this lawsuit, which is not only my life's passion but is also a crucial source of income for me and my family. Granting the requested injunction would further harm my career, my finances, my family's stability, and my mental and physical well-being beyond the harm I am already enduring due to Tribl's wrongful retention of my publishing monies.

19. If I am enjoined from releasing music for the entirety of this litigation, I stand to lose a significant source of income in which I earn an average of $2,500,000.00 yearly.

I declare under penalty of perjury under the laws of the State of Georgia that the foregoing is true and correct.

February 2, 2026                                           Chandler Moore

**EXHIBIT A**

# DEAL MEMO

## Between MoWorks LLC f/s/o CHANDLER MOORE ("Moore") and TRIBL MUSIC GROUP ("TRIBL")

This Production Deal Memo (this "**Deal Memo**") states the material terms of the agreement between Moore and TRIBL with respect to Moore's personal services and the services of TRIBL in connection with the production and commercial exploitation of audio and audiovisual recordings, records, songs, touring activities, and other materials described in this Deal Memo.

| Date | April 18, 2024 |
|---|---|
| Services | During the Term, Moore will render his exclusive personal services in connection with the recording of audio and audiovisual recordings containing Moore's performances, as well as live concert performance dates as specified herein. |
| Term/Product Commitment | One (1) album comprised of at-least ten (10) newly recorded master recordings. The term shall continue until 9 months following release of the initial period album.<br><br>All masters must be: (i) feature the primary featured performances of Moore and (ii) shall be technically and commercially satisfactory as reasonably determined by TRIBL. |
| Option/ Matching Right: | Upon expiration of the first album term, there will be one (1) option for one (1) album comprised of at-least ten (10) master recordings, said option to be mutually exercised by the parties. Notwithstanding the foregoing, if the parties do not exercise the mutual option, TRIBL will have a thirty (30) day first negotiation and matching right on Moore's next album (i.e., the immediately subsequent album to be released by Moore following the initial album delivered hereunder). In the event the parties are unable to reach an agreement during the first look period, and TRBIL subsequently elects not to "match" any other offers, then Moore can sign elsewhere for such album. The option period, if any, will commence on expiration of initial album term and continue until 9 months from release of the second album. |
| Distribution Territory | Worldwide |
| Catalog Recordings | Intentionally deleted. |

| Recording Fund/Artist Advance | Recording Fund:<br><br>LP1: $550,000.00, payable as follows: (i) $300,000.00 will be payable upon execution of this Deal Memo as an in- pocket advance to Moore; (ii) $125,000.00 will be payable to Moore upon execution of this Deal Memo towards the administration of initial recording costs; and(iii) the balance, i.e., $125,000.00, will be paid to Moore following delivery of the recording commitment for the Term.<br><br>LP2: (if mutual option exercised): min/max using TRIBL's standard formula (i.e., 75% of royalties credited to Moore's account derived from LP1 during initial period), subject to following min/max:<br><br>    Min                Max |

| | |
|---|---|
| | $750,000    $1,500,000<br>50% shall be paid to Moore on commencement of option period and the balance (less costs) will be paid upon delivery of LP2. |
| **Creative** | All creative matters will be mutually approved. In the event of any disagreement, TRIBL's good faith decision shall be final. |
| **Legal Fee/Sales Bonus (Additional Advances)** | Intentionally deleted. |
| **Net Profits** | Moore will receive 50% of net profits, defined as gross receipts from the recordings, less all bonafide third party out of pocket costs and expenses paid by TRIBL in connection with the recordings, including, without limitation, all recording, production, distribution and other related expenses (excluding, for purpose of clarity, any of TRIBL's overhead costs and any marketing costs, video production costs, etc. incurred hereunder). On recoupment of all advances paid to Moore, Moore's share of net profits will increase to 65% on a going forward basis. |
| **Royalty Escrow Account** | TRIBL shall exclusively collect and administer all monies. |
| **Marketing Commitment** | TRIBL will fund the marketing and promotion of each album released hereunder in the minimum amount of $100,000. The parties will mutually determine how to expend the marketing funds in connection with the promotion, advertising, marketing and/or publicity relating to recordings hereunder. No such marketing expenditures will be recoupable in calculating Moore's share of net profits. |

| | |
|---|---|
| **Mechanical Royalties** | Mechanical royalties for all songs contained on the recordings will be paid at 100% of the statutory rate in the U.S. and the industry-standard rate in Canada and without regard to any so called "caps". |
| **Accounting** | Semi-annual accounting within 90 days following close of each calendar quarter. Standard audit rights. TRIBL will use reasonable efforts to cause distributor to account directly to Moore via a letter of direction. TRIBL shall use reasonable efforts to provide you an online portal to track monthly revenues and expenses related to the net profit herein. |
| **No Cross-Collateralization** | No cross collateralization of mechanicals with sound recording royalties. |
| **Ownership/License Term** | All recordings will be owned by Moore and exclusively licensed to TRIBL until seven (7) years following the later of: (i) the end of the Term and (ii) recoupment. |

| Touring | TRIBL and Moore will cooperate in a series of concert tour dates (excluding so-called "one-nighters", etc.) by Maverick City Music during the Term. Moore commits to performing 40 shows and TRIBL guarantees Moore a minimum guaranteed Artist fee per show of $35,000 per show (the "Performance Fee"). 30 of the shows shall take place in the US and 10 of the shows shall take place in Africa, with all shows to be completed by December 21, 2024. TRIBL will pay Moore an advance of $1,4000,000 against Moore's Performance Fee (i.e., $35K x 40 = $1,400,000), payable:<br><br>$1,000,000 of which is acknowledged by Moore as received;<br>$200,000 on signing of this Deal Memo;<br>$100,000 after 20 shows have been completed, and<br>$100,000 after the final show.<br><br>For the avoidance, the Performance Fee shall be "all-in", inclusive of all wardrobe, glam and grooming. TRIBL shall provide the production for the Tour with meaningful consultation with Moore (which will be used for the overall tour and not specific to Moore unless otherwise agreed upon) and travel/accommodation, subject to mutual approval. |
|---|---|
| **Merchandise** | Moore's percentage participation from Maverick City merchandise during the tour to be negotiated in good faith prior to any sale of tour merchandise. Moore entitled to sell "Chandler Moore" merchandise at tour date venues and retain the proceeds, subject to venue merchandise policies. TRIBL shall be entitled to a mutually agreed upon % of Moore's merchandise sales on tour depending on which merch company the parties use for the sales. |
| **Maverick City Music Ownership** | Moore shall be eligible for up to 15% equity ownership stake in Maverick City Music, LLC. The vesting schedule for such equity ownership stake will be: (i) 7.5% vested immediately upon the later of execution of this Deal Memo and the Equity Documents (as defined below); and (ii) 7.5% vested upon the later of satisfactory delivery of initial period album, completion of all 40 shows and execution of the Equity Documents. The parties shall enter into any separate agreement(s) as deemed necessary to effectuate the transfer of ownership as contemplated in this Deal Memo. |

| | |
|---|---|
| **Music Publishing** | Prior Publishing Agreement Termination: The existing publishing agreement shall remain in full force and effect with respect to any compositions written prior to execution hereof. <br><br> New Publishing Agreement: <br><br> (i) Nature of Agreement: Moore will sign an exclusive Co-Publishing and Administration Agreement with TRIBL. <br><br> (ii) Territory: The Universe <br><br> (iii) Term: One (1) contract period which shall continue until the later of: (i) January 1, 2026; and (ii) recoupment. Right to cause recoupment at any time after January 1, 2026 anniversary through repayment of 110% of any then-unrecouped balance. <br><br> (iv) Works Covered: All musical works written and/or composed by Moore (whether alone or with others) during the Term ("Compositions"). Acquired compositions specifically excluded, subject to TRIBL's right of first negotiation and matching right if Moore wishes to sell or enter into any publishing agreement with respect to such acquired composition(s) during the Term. All writing costs will be covered by TRIBL's publishing designee. <br><br> (v) Advances: $250,000 payable as follows: 50% upon execution of this Deal Memo and the balance upon the one (1) year anniversary of this Deal Memo. <br><br> (vi) Royalties: <br><br> Mechanicals                               75/25 in Writer's favor <br> Publisher Performance:            50/50 in Writer's favor <br> Synchs & Covers:                      75/25 in Writer's favor <br> Other Income:                            75/25 in Writer's favor <br><br> (viii) Partial Reversion: Partial reversion of admin rights to Writer's writer share 7 years after the Term. No reversion on co-publisher share. <br><br> (ix) Minimum Delivery/Release Requirement: Twelve (12) Compositions <br><br> (x) Accountings: Semi-annual, within 90 days of each quarterly close. <br><br> (xi) Other Terms: To be negotiated in good faith and embodied in a formal publishing agreement, including stepped up provisions throughout. TRIBL to reasonably assist Moore in obtaining RIAA certification plaques on a recoupable basis. If TRIBL licenses any public performance use directly, it shall be entitled to collect all income in connection with such license but will account to writer for the 'writer share" without regard to recoupment. For the avoidance of doubt, monies payable under the publishing deal shall be recouped "on top" with TRIBL's admin fee coming from its share of receipts. |
| **Exit and Upstreaming Clause:** | Intentionally deleted. |

| | |
|---|---|
| **Miscellaneous** | The parties intend to enter into a longer, more formal contract with respect to the subject matter hereof, which contains the terms stated above as well as other terms and conditions which are customary in contracts of this type, which other terms and conditions will be subject to mutual good faith negotiation. Unless and until such more formal contract is signed by both parties hereto, this Deal Memo is legally binding on the parties hereto in accordance with its terms. This Deal Memo is governed by Georgia law and the federal and state courts in Atlanta shall have exclusive jurisdiction. In any action or other proceeding between the parties for relief based in whole or in part on this Deal Memo, or the breach thereof, the prevailing party shall be entitled to recover, in addition to any other relief awarded or granted, its reasonable costs and expenses, including attorneys' fees, incurred in the proceeding. A waiver by either party of any provision or default under this Deal Memo shall not be deemed or construed as a waiver of any future provision or default. |

ACCEPTED AND AGREED TO:

**TRIBL MUSIC GROUP**                               **MoWorks LLC f/s/o Chandler Moore**

By: _/s/ Norman Gyamfi_                              By: _/s/ Chandler Moore_
An Authorized Signatory                              An Authorized Signatory

Printed Name: _Norman Gyamfi_                        Printed Name: _Chandler Moore_

Title: _Co-Founder_                                  Title: _Artist_

157691107.1
157432607.2

## INDUCEMENT

To induce **TRIBL MUSIC GROUP** ("**Company**") to enter into the foregoing agreement ("**Agreement**") with **MoWorks LLC** ("**Lender**"), the undersigned hereby:

      (a)    acknowledges that the undersigned understands and is familiar with all the terms and conditions of the Agreement;

      (b)    assents to the execution of the Agreement and agrees to be bound by the terms and conditions thereof, including, without limitation, each and every provision of the Agreement that relates to the undersigned in any way, directly or indirectly, the services to be rendered thereunder by the undersigned and restrictions imposed upon the undersigned in accordance with the provisions of the Agreement, and hereby guarantees to Company the full and faithful performance of all the terms and conditions of the Agreement by the undersigned and Lender (including, without limitation, all representations, warranties and indemnification obligations set forth in the Agreement); and

      (c)    acknowledges and agrees that Company shall be under no obligation to make any payments to the undersigned or otherwise, for or in connection with this inducement and for or in connection with the services rendered by the undersigned or in connection with the rights granted to Company thereunder and the fulfillment of the undersigned's obligations pursuant to the Agreement.

**AGREED AND ACCEPTED:**

*DocuSigned by:*
*Chandler Moore*
789FA7DB64634E3...
**Chandler Moore**

157691107.1
157432607.2

**DocuSign**

| Certificate Of Completion | | |
|---|---|---|
| Envelope Id: 1EEDA947491747209C4BE888B35FA3FC | | Status: Completed |
| Subject: Chandler Moore - TRIBL - Deal Memo - FINAL (4.23.24) | | |
| Source Envelope: | | |
| Document Pages: 6 | Signatures: 3 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Christopher Sabec |
| AutoNav: Enabled | | 2000 Market Street |
| EnvelopeId Stamping: Enabled | | Philadelphia, PA  19103 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | |
| | | IP Address: 216.200.153.71 |

| Record Tracking | | |
|---|---|---|
| Status: Original<br>        4/23/2024 1:40:33 PM | Holder: Christopher Sabec | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Chandler Moore<br><br>Artist<br>Security Level: Email, Account Authentication (None) | **DocuSigned by:**<br>*Chandler Moore*<br>789FA7DB64634E3...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 104.28.85.108 | Sent: 4/23/2024 1:42:51 PM<br>Viewed: 4/23/2024 1:55:14 PM<br>Signed: 4/23/2024 1:59:19 PM |
| **Electronic Record and Signature Disclosure:**<br>        Accepted: 4/23/2024 1:55:14 PM<br>        ID: 9c9a9af6-3577-464a-9dc2-ded4d1388ca3<br>        Company Name: Fox Rothschild LLP | | |
| Norman Gyamfi<br><br>Co-Founder<br>Security Level: Email, Account Authentication (None) | **DocuSigned by:**<br>*Norman Gyamfi*<br>03F5A82EA3B84EB...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: 108.223.168.88 | Sent: 4/23/2024 1:42:52 PM<br>Viewed: 4/23/2024 1:48:27 PM<br>Signed: 4/23/2024 1:55:06 PM |
| **Electronic Record and Signature Disclosure:**<br>        Accepted: 4/23/2024 1:48:27 PM<br>        ID: 864846b5-60d4-478d-9d0c-35c185d58897<br>        Company Name: Fox Rothschild LLP | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Markel Ringer<br><br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 4/23/2024 1:42:52 PM<br>Viewed: 4/23/2024 3:29:28 PM |
| **Electronic Record and Signature Disclosure:**<br>        Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 4/23/2024 1:42:52 PM |
| Certified Delivered | Security Checked | 4/23/2024 1:48:27 PM |
| Signing Complete | Security Checked | 4/23/2024 1:55:06 PM |
| Completed | Security Checked | 4/23/2024 1:59:19 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 7/12/2018 5:40:50 PM
Parties agreed to: Chandler Moore, Norman Gyamfi

Case 1:25-cv-05635-SEG    Document 52-1    Filed 02/03/26    Page 17 of 19

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**
From time to time, Fox Rothschild LLP ("we," "us," or the "Firm") may need to provide to you certain written notices, disclosures, authorizations, acknowledgments, agreements, or other transactional documents (collectively, "Documents"). Described below in this Electronic Record and Signature Disclosure ("Disclosure") are the terms and conditions for providing to you such Documents electronically through the DocuSign, Inc. ("DocuSign") electronic signing system, and for using your electronic signature in connection with those Documents rather than obtaining your handwritten signature. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Documents will be sent to you electronically:**
Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all Documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any Documents, we prefer to provide these Documents to you by the same method and to the same address that you have given us. Thus, you can receive the Documents electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below.

**To advise the Firm of your new e-mail address:**
It is your responsibility to provide us with a current, valid email address and to promptly update any changes to this information. To let us know of a change in your e-mail address where we should send Documents electronically to you, you must send an email message to us at helpdesk@foxrothschild.com and in the body of such request you must state: (1) your previous e-mail address, and (2) your new e-mail address. We do not require any other information from you to change your email address. In addition, you must notify DocuSign to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from the Firm:**
At any time, you may request from us a paper copy of any Document or record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. To request delivery from us of paper copies of the Documents previously provided by us to you electronically, you must send us an e-mail to helpdesk@foxrothschild.com and in the body of such request you must state your e-mail address, full name, US Postal address and telephone number.

**To decline your consent with the Firm:**
If you do not want to receive Documents from us electronically, you have a right to decline consent and receive Documents only in paper format. If you elect to receive required Documents only in paper format, it may slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required Documents to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper Documents.

To decline consent you may either:
i. Decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
ii. Send us an e-mail to helpdesk@foxrothschild.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent.
This will indicate to us that you have withdrawn your consent to receive required Documents electronically from us and you will no longer be able to use the DocuSign system to receive required Documents electronically from us or to sign electronically documents from us.

**To withdraw your consent with the Firm:**
If you decide to receive Documents from us electronically, you may at any time change your mind and tell us that thereafter you want to receive Documents only in paper format. To indicate to us that you are changing your mind, send us an e-mail to helpdesk@foxrothschild.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number.

**How to contact Fox Rothschild LLP:**
You may contact the Firm with any questions or concerns about DocuSign or this Disclosure by sending an email message to: helpdesk@foxrothschild.com.

**Required hardware, software, and operating systems:**
You are responsible for installation, maintenance, and operation of your computer, browser, and software. The Firm is not responsible for errors or failures from any malfunction of your computer, browser, or software. The Firm is also not responsible for computer viruses or related problem associated with the use of an online system, or any delay or failure in connection with your receipt of email notices or other notices, disclosures, or information from the Firm. The following are minimum hardware, software, and operations requirements necessary to receive electronic Documents through DocuSign.

| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
|---|---|
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | Allow per session cookies |

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**
To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for

your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic ELECTRONIC RECORD AND SIGNATURE DISCLOSURE document; and
- I can print on paper the Disclosure or save or send the Disclosure to a place where I can print it, for future reference and access; and
- Until or unless I notify Fox Rothschild LLP as described above, I consent to receive through electronic means all notices, disclosures, authorizations, acknowledgements, and and other transactional documents that are to be provided or made available to me by Fox Rothschild LLP during the course of my relationship with the Firm.