UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHANDLER MOORE, *et. al.*,

Plaintiffs,

v.

NORMAN GYAMFI, *et al.*,

Defendants.

CIVIL ACTION NO.

1:25-CV-5635-SEG

# ORDER

This case comes before the Court on Defendants' motion to dismiss. (Doc. 22.) After careful consideration, the Court enters the following order.

## I. Factual Background[1]

This is a breach of contract action between a Christian music artist, Chandler Moore and MoWorks LLC ("Plaintiffs") and Defendants Norman Gyamfi ("Gyamfi"), Insignia Holding Company ("Insignia Holding"), Insignia Assets, LLC ("Insignia Assets"), TRIBL Publishing Inc. ("TRIBL Publishing"), TRIBL Records, LLC ("TRIBL Records"), Maverick City Music, Inc., ("Maverick City Music"), and Maverick City Music Publishing, LLC ("Maverick City Publishing") (collectively, "Defendants").

[1] For purposes of resolving the pending motion to dismiss, the Court accepts the well-pled allegations as true and construes them in the light most favorable to Plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012).

Moore is a Grammy Award winning Christian musician who has been releasing music since 2014. (Compl., Doc. 1 ¶¶ 24-25.) Moore is "widely recognized as a founding member and frequent collaborator with the contemporary Christian music collective, Maverick City Music." (*Id.* ¶ 24.) In 2020, Gyamfi began acting as Moore's personal and business manager, "providing advice, counsel, and direction to Moore." (*Id.* ¶ 27.) As part of his role, Gyamfi "exercised control over nearly all aspects of Moore's career, financial affairs, and business dealings, including but not limited to Moore's access to his own personal financial assets." (*Id.* ¶ 29.) It was "Gyamfi's regular practice to engage in informal business dealings on behalf of Moore." (*Id.* ¶ 31.) Gyamfi continued as Moore's personal and business manager until 2023. (*Id.* ¶ 35.)

Around 2020, Moore introduced Gyamfi to the ownership and team at Maverick City Music. (*Id.* ¶ 28.) At that time, Moore was one of the only members at Maverick City Music that had "little to no formal contracts or agreements governing the terms of his business relationship" with Maverick City Music. (*Id.* ¶ 31.) Without informing Moore and while he was still Moore's manager, Gyamfi acquired an ownership interest in Maverick City Music. (*Id.* ¶ 32.) According to Plaintiffs, Gyamfi then "secretly transferr[ed] Moore's ownership and copyright interests in his works to Maverick City Music as well as broker[ed] a deal to convey Moore's master recordings of songs created with

Maverick City Music to The Orchard, a Sony Music Entertainment entity." (*Id.* ¶ 34.) Plaintiffs further allege that Gyamfi and the Insignia entities directed publishing entities, including Essential Music Publishing LLC, "to pay all of [Moore's] publishing monies directly to Gyamfi and the Insignia entities and to channel all communications and accountings through Gyamfi and the Insignia entities." (*Id.* ¶ 36.)

Plaintiffs state that "Maverick City Music spawned a number of related entities, including but not limited to the Defendant entities." (*Id.* ¶ 38.) They further allege that Insignia Assets was created by Gyamfi to function as the parent company of these entities, and Gyamfi acts as the representative for each of the Defendant entities. (*Id.* ¶¶ 38-39.)

**A. Initial Deals Brokered by Gyamfi**

On April 13, 2021, "Moore and Maverick City Music entered into an agreement whereby Maverick City Music would convey a ten (10%) percent ownership interest in Maverick City Music to Moore upon his fulfillment of certain obligations, including but not limited to, attendance at Maverick City Music events, quarterly recording requirements, and coordination and collaboration on projects and releases." (*Id.* ¶ 40.)

That same year, Gyamfi brokered a deal selling Maverick City Music's master recordings to The Orchard. (*Id.* ¶ 41.) Gyamfi received a commission

for this deal. (*Id.*) Plaintiffs allege that Moore never received prior notice or disclosure of this deal or that Gyamfi was profiting from it. (*Id.*)

Following the sale of Maverick City Music's master recordings, Gyamfi demanded that Essential Music Publishing LLC ("Essential"), the Christian music publishing division of Sony Music Entertainment, pay all proceeds earned in connection with the publication of Moore's compositions and works directly to TRIBL Publishing, TRIBL Records, and Maverick City Music instead of Moore. (*Id.* ¶ 42.) Gyamfi demanded that Essential send all accountings and communications directly to him. (*Id.* ¶ 43.) Plaintiffs state that Essential requested proof of TRIBL Publishing, TRIBL Records, and Maverick City Music's right to receive proceeds and accountings on behalf of Moore, and Gyamfi fraudulently affixed Moore's signature to a publishing agreement to satisfy Essential's requirements. (*Id.* ¶¶ 44-45.)

**B. The "Fraudulent Publishing Agreement"**

Plaintiffs allege that on January 1, 2022, Gyamfi fraudulently entered into a Publishing Agreement[2] on behalf of Moore and Maverick City Music without Moore's consent. (*Id.* ¶ 46; Publishing Agreement, Doc. 22-1.) Plaintiffs allege that Gyamfi never discussed or reviewed the Publishing Agreement with Moore. (Doc. 1 ¶ 46.) Plaintiffs further claim that Moore's

[2] The full title of the allegedly fraudulent Publishing Agreement was "Exclusive Songwriting Co-Publishing Agreement." (Doc. 1 ¶ 46.)

signature was forged onto the Publishing Agreement, as he "had no knowledge of the existence of the Publishing Agreement at the time it was signed, never signed the Publishing Agreement himself, nor authorized Gyamfi or anyone else to sign the Publishing Agreement on his behalf." (*Id.* ¶ 47.)

The terms of the Publishing Agreement, as Plaintiffs allege, include the following. First, the Publishing Agreement "purported to assign and transfer an undivided fifty percent (50%) interest in Moore's compositions, works, copyrights, titles and interests in proceeds obtained as a result of Moore's past and future works, compositions, and services to Maverick City Music, including but not limited to Moore's solo works and collaborations with Maverick City [Music]." (*Id.* ¶ 48.) Further, the Publishing Agreement grants Maverick City Music "an irrevocable Power of Attorney, purporting to allow Maverick City Music to utilize Moore's name and/or stand in his place or stead to take any action, sign and execute any document, and transfer Moore's rights in his works and composition." (*Id.* ¶ 49.) Plaintiffs state that the Power of Attorney is unlimited in scope and duration since the Publishing Agreement states it will survive the termination of the Agreement. (*Id.* ¶ 50.) The Publishing Agreement also allows Maverick City Music to take these actions even if Moore refuses to sign the documents or agree as long as a "good faith effort is made to obtain his consent and/or signature." (*Id.*) Additionally, the Publishing Agreement permits Maverick City Music to sign letters and notices of

assignment of Moore's copyrights and rights to proceeds and accountings. (*Id.* ¶ 51.) Finally, the Publishing Agreement grants Maverick City Music the exclusive right to collect and receive proceeds from all licenses issued under the Publishing Agreement in perpetuity. (*Id.* ¶ 57.)

Plaintiffs also allege Moore's signature was forged[3] on several attachments to the Publishing Agreement, including (1) the Assignment of Copyright in all prior compositions ("Assignment"); (2) the Notice of Transfer to Public Performance Rights Society ("Notice of Transfer"); (3) the Notice of Assignment of Copyrights and Income ("Notice of Assignment"); and (4) Christian Copyright Licensing International Notice of Assignment ("CCLI Notice"). (*Id.* ¶ 52.) Moore alleges that his signature was forged, as he never signed any of these documents himself nor authorized them to be signed on his behalf. (*Id.* ¶¶ 53-56.)

The attachments included the following conditions. In the Assignment, Moore transfers and assigns an undivided fifty percent (50%) interest in his copyrighted works dating back to 2018. (*Id.* ¶ 53.) In the Notice of Transfer, Moore "names Maverick City Music as an administrator over his public

[3] Plaintiffs allege that Moore confronted Gyamfi about the fraudulently obtained signature in 2024, and Gyamfi stated he was unsure who signed on behalf of Moore, but he had access to the IP address information and would look further into it; Gyamfi never provided any further information. (Doc. 1 ¶¶ 58-59.)

performance rights and requires that all proceeds be directed to Maverick City Music rather than to him until Maverick City Music notifies the Public Performance Rights Society that the transfer agreement is terminated." (*Id.* ¶ 54.) In the Notice of Assignment, Moore purportedly transferred the exclusive right to own and administer all musical compositions that he owns or co-owns to Maverick City Music and requires all proceeds earned in relation to those compositions be paid directly to Maverick City Music. (*Id.* ¶ 55.) Finally, in the CCLI Notice, Moore purportedly authorizes and directs the Copyright Administration of the Christian Copyright Licensing International to pay all proceeds earned in relation to Moore's public performance rights directly to Maverick City Music. (*Id.* ¶ 56.)

**C. The Deal Memo**

On April 18, 2024, Plaintiffs allege that Moore, TRIBL Publishing, and TRIBL Records ("TRIBL Defendants") entered into an agreement entitled "Production Deal Memo" ("Deal Memo") whereby Moore agreed to satisfy specific live performance, recording, and publishing obligations. (*Id.* ¶ 60; Deal Memo, Doc. 1-1.) The Deal Memo obligated Moore to "(1) record one album of at least ten (10) newly recorded master recordings ("Recording Obligations"); (2) commit to performing in a series of forty (40) concert-tour dates by December 21, 2024 ("Touring Obligations"); and (3) deliver at least twelve (12) compositions ("Publishing Obligations")." (*Id.* ¶ 61.) The Deal Memo also

obligated the TRIBL Defendants "to pay Moore (1) an advance of $300,000.00 upon execution of the Deal Memo; (2) $125,000.00 towards the initial recording costs upon execution of the Deal Memo; and (3) $125,000.00 following delivery of the recorded product. If the mutual extension option is exercised, TRIBL Defendants would be obligated to credit seventy-five percent (75%) of royalties derived from the recorded product at a minimum of $750,000.00 and a maximum of $1,500,000.00." (*Id.* ¶ 62.)

In connection with Moore's Touring Obligations, the Deal Memo obligated the TRIBL Defendants "to pay Moore an advance of $1,400,000.00 as follows: (1) $200,000.00 upon execution of the Deal Memo; (2) $100,000.00 upon completion of twenty (20) shows; (3) $100,000.00 following completion of the final show; and (4) $1,000,000.00 acknowledged as received." (*Id.* ¶ 63.) In connection with Moore's Publishing Obligations, the Deal Memo obligated the TRIBL Defendants "to pay Moore an advance of $250,000.00 as follows: (1) $125,000.00 upon execution of the Deal Memo; and (2) $125,000.00 upon the one-year anniversary of the Deal Memo." (*Id.* ¶ 64.) Further, the TRIBL Defendants were obligated "to pay Moore (1) seventy-five (75%) percent of all mechanical royalties; (2) fifty (50%) percent of all performance royalties; (3) seventy-five (75%) of all royalties from synchronization rights and covers; and (4) seventy-five (75%) of all other income received." (*Id.*)

Additionally, the Deal Memo obligated the TRIBL Defendants "to pay Moore fifty (50%) percent of all net profits from the sound recordings excepting all third party costs and expenses paid by TRIBL Defendants for the sound recordings, provide semiannual accounting records within ninety (90) days following the closing of each quarter, and adhere to the policy of no cross collateralization of compositional royalties with sound recording royalties." (*Id.* ¶ 65.) Further, the Deal Memo required the TRIBL Defendants "to convey Moore a fifteen percent (15%) ownership interest in Maverick City Music in accordance with the following vesting schedule: (1) 7.5% vested immediately upon the later of the execution of the Deal Memo and the equity documents … and (2) 7.5% vested upon the later of Moore's satisfactory delivery of the initial period album (pursuant to Moore's Recording Obligations), completion of the forty (40) shows (as contemplated by the Touring Obligations), and execution of the equity documents." (*Id.* ¶ 66.) The Deal Memo also states that the TRIBL Defendants will cover marketing expenses in the amount of $100,000.00 at a minimum and that marketing is a non-recoupable expense. (*Id.* ¶ 67.) The Deal Memo further contemplated "Moore and TRIBL Defendants' intention to enter into a longer, more formal publishing agreement and explicitly recognizes their obligation to negotiate the terms to be included therein in good faith." (*Id.* ¶ 68.) Finally, with respect to works and

compositions written prior to the Deal Memo, the Publishing Agreement "purportedly still controls." (*Id* ¶ 64.)

Plaintiffs allege that Moore satisfied the live performance and Publishing Obligations required by the Deal Memo, but that Moore and the TRIBL Defendants renegotiated the terms of the recording obligation clause. (*Id*. ¶ 69.) Moore also alleges that he satisfied the Touring Obligations, but the TRIBL Defendants cancelled six shows and failed to compensate Moore in accordance with the terms of the Deal Memo. (*Id*. ¶ 70.) Additionally, Plaintiffs claim that Moore and the TRIBL Defendants agreed that Moore's latest album, comprised of seven songs, would satisfy Moore's Recording Obligations, subject to the understanding that three of Moore's preexisting recorded songs would be used to create a deluxe version of the album and that Moore would be able to serve as an executive producer on a number of Maverick City Music records. (*Id*. ¶ 71.) Upon request from the TRIBL Defendants, Moore provided a proposed written amendment memorializing the oral agreement, but during this process, Gyamfi and the TRIBL Defendants "unilaterally attempted to impose completely different terms that were well beyond the scope of what was originally agreed." (*Id*. ¶¶ 72-73.)[4] Because of

[4] For example, "Gyamfi and TRIBL Defendants demanded, among other things, that Moore also agree to extend Moore's publishing commitment an additional two (2) years, to withdraw Moore's ownership stake in Maverick

these "unconscionable" requests, the negotiations on the written amendment "fell apart," and the parties "continued their duties under the terms of the original Deal Memo subject to the oral agreement regarding satisfaction of Moore's Recording Obligations." (*Id.* ¶ 75.)

Also, during this period, Moore was requesting "accurate and timely accountings in accordance with TRIBL Defendants' obligations under the Deal Memo to no avail." (*Id.* ¶ 76.) On the "rare occasions" that Moore did receive accountings, "they were not timely and did not accurately reflect the royalties to which Moore is entitled." (*Id.*) Plaintiffs allege that at the time Moore filed his complaint, he had yet to receive accountings that accurately reflect the agreements in the Deal Memo. (*Id.* ¶ 77.) Plaintiffs allege the TRIBL Defendants owe Moore more than $800,000 in publishing proceeds. (*Id.* ¶ 78.)

Plaintiffs allege that once Moore began demanding accurate accounting, the TRIBL Defendants sent Moore a Notice of Breach of the Deal Memo stating he was in breach for failure to deliver ten newly recorded master recordings and demanding that Moore remedy the breach within thirty days. (*Id.* ¶ 79.) Moore alleges this Notice of Breach was a pretextual reaction to Moore questioning the wrongful activities of the Defendants. (*Id.* ¶ 80.) Moore alleges he has substantially performed his obligations under the Deal Memo.

---

City Music, and to receive a fifteen percent (15%) override on Moore's subsequent two albums." (*Id.* ¶ 74.)

(*Id.* ¶ 79.) Moore also alleges that Defendants "unlawfully cross-collateralize monies earned from Moore's entire catalog of masters with his new masters, contrary to the terms of the Deal Memo" and "continue to withhold proceeds, royalties, and monies rightfully owed to Moore in violation of the Deal Memo." (*Id.* ¶¶ 82-83.) Finally, Plaintiffs allege that "Defendants' unlawful, fraudulent, and unconscionable business practices have permeated and, thereby, tainted every agreement between Plaintiffs and Defendants as evidenced by the innumerable breaches, violations, and instances of misconduct referenced herein." (*Id.* ¶ 84.)

Based on the facts alleged, Plaintiffs bring seven claims against all Defendants. The claims are breach of contract (Count I), unjust enrichment (Count II), computer forgery (Count IV), identity fraud (Count V), conversion (Count VI), rescission (Count VII), and equitable accounting (Count VIII). (*Id.* at 22-31.) Plaintiffs also bring a breach of fiduciary duty claim against Gyamfi (Count III). (*Id.* at 24-25.) Plaintiffs seek declaratory relief, compensatory and punitive damages, equitable relief, and attorneys' fees. (*Id.* at 32.)

## II. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a case when the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When evaluating a Rule 12(b)(6) motion, the court must take the facts alleged in the complaint as true and construe them in the

light most favorable to the plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully," and when the "complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citing *Twombly*, 550 U.S. at 557). The complaint thus must contain more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action"—it must allege facts that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## III. Discussion

Plaintiffs bring eight claims against Defendants. The claims include breach of contract (Count I), unjust enrichment (Count II), computer forgery (Count IV), identity fraud (Count V), conversion (Count VI), rescission (Count VII), and equitable accounting (Count VIII). (Doc. 1 at 22-31.) Plaintiffs also bring a breach of fiduciary duty claim against Gyamfi (Count III). (*Id.* at 24-25.) Defendants do not seek dismissal of all claims. They do not move to dismiss the claim for breach of fiduciary duty (Count III) against Gyamfi nor the conversion claim against all Defendants (Count VI). (*See* Motion to Dismiss, Doc. 22.) Defendants seek dismissal of the remaining six claims. The Court will consider each in turn. Before doing so, the Court will first address the alter ego allegations, upon which many of Plaintiffs' claims rely.

### A. Alter Ego Liability

Plaintiffs claim that the entity Defendants are "alter ego entities" of Defendant Gyamfi and that they have "represented themselves and acted as the same entity through various corporate officers[.]" (Doc. 1 ¶¶ 11-12.) Plaintiffs add that "Defendants' corporate forms have each been used as a shell for Norman Gyamfi to conduct and fund his personal business and to fund and operate the Insignia entities including, without limitation, the named Defendants, interchangeably." (*Id.* ¶ 15.) Plaintiffs stress that "Defendants"

directed that publishing monies "be paid directly to Insignia entities" even though that arrangement was not contemplated by contract. (*Id.* ¶ 14.) Plaintiffs assert that "any separation or distinction between the Defendants, therefore, should be discarded[,]" and "as alter egos of each other, Defendants are each liable for the acts of the other." (*Id.* ¶¶ 16, 18.) Through their alter ego allegations, Plaintiffs seek to hold all Defendants liable for all claims, except for those asserted exclusively against Gyamfi in Count III.

"A cardinal precept of corporate law is that corporations are separate legal entities from their shareholders, officers, directors, and employees." *Dep't of Transp. v. McMeans*, 294 Ga. 436, 437 (2014). "Under the alter ego doctrine, equitable principles are used to disregard the separate and distinct legal existence possessed by a corporation where it is established that the corporation served as a mere alter ego or business conduit of another." *Kissun v. Humana, Inc.*, 267 Ga. 419, 419-20 (1997).

Because the alter ego doctrine rests on equitable principles, it "cannot be applied unless there is an inadequate remedy at law." *Ralls Corp. v. Huerfano River Wind, LLC*, 27 F. Supp. 3d 1303, 1329 (N.D. Ga. 2014) (citing *Baillie Lumber Co. v. Thompson*, 612 S.E.2d 296, 299 (Ga. 2005)). For this reason, the Georgia Supreme Court has held that, "as a precondition to a plaintiff's piercing the corporate veil and holding individual shareholders liable on a corporate claim . . . there [must] be insolvency on the part of the corporation in

the sense that there are insufficient corporate assets to satisfy the plaintiff's claim." *Johnson v. Lipton*, 254 Ga. 326, 327 (Ga. 1985); *see also Anderson v. Am. Family Ins. Co.*, No. 5:15-CV-475 (MTT), 2016 WL 3633349 at *6 (M.D. Ga. June 29, 2016) ("Absent an allegation of insolvency or insufficient assets to satisfy a claim, a plaintiff fails to state a claim for piercing the corporate veil to hold a parent company or shareholder liable.") To support alter ego liability, Plaintiffs further must demonstrate the following:

> (1) that the stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; (2) that there is such a unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist; and (3) that to adhere to the doctrine of corporate entity would promote injustice or protect fraud.

*See Functional Prod. Trading, S.A. v. JITC, LLC*, No. 1:12-CV-355-WSD, 2014 WL 3749213 at *5 (N.D. Ga. July 29, 2014) (quoting *Derbyshire v. United Builders Supplies, Inc.*, 392 S.E.2d 37, 40 (Ga. Ct. App. 1990)); *see also Travelers Prop. Cas. Co. of Am. v. Clucis*, No. 1:20-CV-00276-SDG, 2022 WL 4773493, at *8 (N.D. Ga. Sept. 30, 2022) (stating that a plaintiff asserting alter ego liability generally must "adduce evidence of fraud, abuse of the corporate form, commingling of assets, or corporate insolvency at the time of the transaction."). The Supreme Court of Georgia has admonished that "great caution should be taken by courts in disregarding the corporate entity." *McMeans*, 754 S.E.2d at 63.

Here, Plaintiffs have not pled sufficient facts to support Defendants' collective liability under the alter ego doctrine. First, as to Defendants' insolvency, Plaintiffs' sole allegation is that one Defendant—Maverick City Publishing—is "defunct." (*See* Doc. 1 ¶ 13.) As an initial matter Plaintiffs' allegation that Maverick City Publishing is "defunct" does not necessarily indicate it is "insolvent." But further, Plaintiffs provide no additional allegations to show insolvency for any other Defendant. (*See* Doc. 1.) *See e.g., Savannah Oaks Condo. Ass'n, Inc. v. Waste Mgmt., Inc.*, No. CV 1:17-CV-330-SCJ, 2019 WL 1906271, at *6 (N.D. Ga. Feb. 15, 2019) (finding alter ego theory was insufficiently pled where the plaintiff failed to show insolvency, *i.e.*, that the corporate defendant had insufficient assets to satisfy the plaintiff's claim).

Second, Plaintiffs do not plead sufficient, non-conclusory facts to satisfy the other elements of the alter ego liability standard. True, Plaintiffs plead that Gyamfi created some of the Defendant entities and that "Defendants" directed certain monies to the Insignia defendants. But "[t]he mere fact that a person owns and controls a corporation will not justify a finding of abuse of the corporate entity, even though that person may have used the corporation to promote his own ends." *United States v. Fid. Cap. Corp.*, 920 F.2d 827, 837 (11th Cir. 1991). "Similarly, that two corporations have been incorporated by the same party and have the same officers does not mean that the two corporations are interchangeable." *Id.*

Further, the foregoing allegations aside, Plaintiffs' factual allegations generally consist of mere recitation of the elements of alter ego liability: "[a] unity of interest and ownership has existed between Defendants," "each of them are alter ego entities of individual Defendant Norman Gyamfi and/or are directed, influenced and controlled thereby," "they acted as the same entity," and the entities are "used as a shell" for Gyamfi to conduct personal business. These conclusory allegations, without more, are insufficient to establish alter ego liability. *See e.g. Phoenix Senior Living LLC v. Anniston Assisted Living, LLC*, No. 1:23-CV-02669-JPB, 2024 WL 5673271, at *2 (N.D. Ga. Feb. 29, 2024) ("Plaintiff's allegations amount to a mere recitation of the elements required to establish alter ego liability rather than providing specific facts demonstrating that such a relationship existed between Defendants.").

Given Plaintiffs' largely conclusory allegations and the "great caution" courts should exercise before disregarding the corporate form, the Court finds that Plaintiffs have not plausibly pled alter ego liability. Therefore, the Court will consider Plaintiffs' claims without applying their alter ego liability theory.[5]

**B. Breach of Contract (Count I)**

Defendants first move to dismiss the breach of contract claim because they contend that none of the Defendants was a counterparty to the contract

[5] Should Plaintiffs discover more specific facts in support of alter ego liability, the Court would consider a motion for leave to amend.

at issue. (Doc. 22 at 14, 16-20.) The Court will begin with the TRIBL Defendants and then move to discussion of the remaining Defendants.

The elements of a breach of contract claim in Georgia are: (1) the breach and (2) resultant damages (3) to the party who has the right to complain about the contract being broken. *Norton v. Budget Rent a Car Sys., Inc.*, 705 S.E.2d 305, 306 (Ga. Ct. App. 2010).

Here, the relevant contract is the Deal Memo, entered in 2024 by Plaintiffs and an entity listed on the contract as "TRIBL Music Group." (*See* Doc. 1-1 at 2-12.) Plaintiffs expressly plead that the counterparties to the Deal Memo were the TRIBL Defendants. (Doc. 1 ¶ 60.) Plaintiffs allege that they have performed their obligations under the contract but that the TRIBL Defendants have breached the agreement by failing to: "(1) pay Plaintiffs the remaining $125,000.00 publishing advance by April 23, 2025; (2) pay Plaintiffs publishing royalties in accordance with the terms of the Royalties subsection; (3) produce accurate and timely accountings to Plaintiffs; [and] (4) pay Plaintiffs fifty percent (50%) of all net profits from the recordings after all costs have been recuperated." (*Id.* ¶ 89.) Plaintiffs also allege that they have suffered damages because of the breach. (*Id.* ¶ 97.)

Defendants argue that Plaintiffs' breach of contract claim must fail because there was no privity between Plaintiffs and any of the Defendants. (Doc. 22 at 13.) This is because, according to Defendants, the counterparty to

the Deal Memo is actually a separate entity called "TRIBL Music Group" rather than the Defendants here, TRIBL Publishing and TRIBL Records. (*Id.* at 14.) Plaintiffs, in response, claim they have "never heard of [TRIBL Music Group] until seeing the instant motion" and that Moore had every reason to believe he was contracting with the TRIBL Defendants named here. (*See* Doc. 29 at 13-14.)

Given the similarity in names as between the TRIBL Defendants and "TRIBL Music Group," it is at least plausible that "TRIBL Music Group" referred to the two TRIBL Defendants together and that Plaintiffs thus sued the correct entities. Further, at the motion-to-dismiss stage, the Court must accept Plaintiffs' well-pled allegations as true, and thus any dispute about the proper counterparties to the contract must be resolved through discovery. Therefore, the Court concludes that Plaintiffs have stated a plausible breach of contract claim against TRIBL Publishing and TRIBL Records, and Defendants' motion to dismiss is DENIED, as to both TRIBL Defendants.

However, as for the remaining Defendants—Insignia Holding and Insignia Assets ("Insignia Defendants"), Maverick City Music, Maverick City Publishing, and Gyamfi—the Court agrees with Defendants. Given that the Court rejects at this stage Plaintiffs' theory of alter ego liability, these remaining Defendants are not counterparties to the Deal Memo, and therefore Plaintiffs' breach of contract claim against them cannot proceed. *See Plaza*

*Props., Ltd. v. Prime Bus. Invs., Inc.*, 240 Ga. App. 639, 642 (1999) (cleaned up) ("It is also fundamental that [a] person who is not a party to a contract (i.e., is not named in the contract and has not executed it) is not bound by its terms.").[6] Therefore, Defendants' motion to dismiss Plaintiffs' breach of contract claim against the Insignia Defendants, Maverick City Music, Maverick City Publishing, and Gyamfi is GRANTED.

### C. Unjust Enrichment (Count II)

Plaintiffs allege that they have substantially performed the recording, touring, and publishing obligations in the Deal Memo, but that Defendants have unlawfully appropriated and retained Plaintiffs' publishing proceeds. (Doc 1. ¶¶ 99-100.) Based on these allegations, Plaintiffs bring an unjust enrichment claim against Defendants. (*Id.*) Defendants seek dismissal of Plaintiffs' unjust enrichment claim because a valid contract (the Deal Memo) exists. (Doc. 22 at 20.) In their response, Plaintiffs do not address the unjust enrichment claim at all. (*See* Doc. 29.)

---

[6] Gyamfi signed the Deal Memo as an "authorized signatory" on behalf of TRIBL Music Group. (Doc. 1-1 at 6.) The fact that Gyamfi signed on behalf of an entity is not a sufficient basis to hold Gyamfi personally liable under the contract. *See, e.g., EMAA, LLC v. Century Communities of Georgia*, No. 1:19-CV-3687-AT, 2023 WL 9051453, at *32 n.23 (N.D. Ga. Mar. 15, 2023) ("Arenas, however, would not be personally liable for breach of contract for his signature in his capacity as Managing Member of EMAA, as he was not personally a party to the contract."). Nothing in the plain language of the contract, moreover, suggests that Gyamfi is a party to the contract or that he intended to bind himself personally.

"To state a claim for unjust enrichment a plaintiff must show that (1) a benefit was provided, (2) compensation for that benefit was not received, and (3) the failure to compensate renders the transaction unjust." *Hill for Credit Nation Capital, LLC v. Duscio*, 292 F. Supp.3d 1370, 1378 (N.D. Ga. 2018) (quoting *Ralls Corp.*, 27 F. Supp. 3d at 1329). "To prevail on a claim for unjust enrichment, a plaintiff thus must ultimately prove (1) that it conferred a benefit on the defendant and (2) that equity requires the defendant to compensate for that benefit." *Brooks v. Branch Banking and Trust Co.*, 107 F. Supp. 3d 1290, 1298 (N.D. Ga. 2015) (quoting *Shutz Container Sys., Inc. v. Mauser Corp.*, No. 1:09-CV-3609-RWS, 2012 WL 1073153, at *35 (N.D. Ga. Mar. 28, 2012)).

In Georgia, "[t]he theory of unjust enrichment applies when there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated." *Smith Serv. Oil Co. v. Parker*, 250 Ga. App. 270, 271 (2001). Defendants contend that, according to Plaintiffs' express allegations, there is a valid contract and so Count II must be dismissed. (Doc. 22 at 20.) Plaintiffs provide no response to Defendants' argument. (*See* Doc. 29; *Demmons v. Fulton Cnty.*, No. 1:09-CV-2312-TWT-WEJ, 2010 WL 3418325, at *11 (N.D. Ga. Aug. 2, 2010), *report and recommendation adopted*, No. 1:09-CV-2312-TWT, 2010 WL 3418328 (N.D. Ga. Aug. 25, 2010) ("Failure to respond to an opposing party's argument constitutes abandonment of that

claim and warrants its dismissal.”).) Accordingly, the Court agrees with Defendants and DISMISSES Plaintiffs’ unjust enrichment claim (Count II) because a valid contract exists.[7]

**D. Computer Forgery and Identity Fraud (Counts IV and V)**

Defendants move to dismiss Plaintiffs’ computer forgery and identity fraud claims. Georgia law recognizes a civil cause of action for using a computer to sign a fictitious name or the name of another person “who did not give such authority.” O.C.G.A. §§ 16-9-93, 16-9-1. Similarly, under Georgia law, “[a]ny consumer victim who suffers injury or damages as a result of a violation” of Georgia’s identity-fraud statute may bring a civil action against a party who willfully and fraudulently uses their identifying information without their authorization or consent. O.C.G.A. §§ 16-9-121(a)(1), 16-9-130(a).

Plaintiffs allege that Gyamfi and Maverick City Music “were involved in creating a forged signature for Moore in execution of the Publishing Agreement” and knowingly signed Moore’s name on the “Publishing Agreement, Assignment, Notice of Transfer, Notice of Assignment, and CCLI Notice […] with the knowledge that Moore was neither aware of the existence of these agreements nor had authorized anyone to sign on his behalf[.]” (Doc.

[7] Outside of the Deal Memo, Plaintiffs claim that “Defendants have also benefited from the unlawful retention of other monies that rightfully belong to Plaintiffs.” (Doc. 1 ¶ 101.) This group-pled allegation lacks specific factual support and is too vague and conclusory to save the unjust enrichment claim.

1 ¶¶ 109-110.)[8] Defendants raise two arguments in response. First, Defendants argue that Plaintiffs' allegations regarding his forged signature are "implausible" for a series of reasons, (Doc. 22 at 28), but as mentioned previously, at the motion-to-dismiss stage, the Court must read all well-pled allegations in the light most favorable to Plaintiffs. Thus, Defendants' factual disputes cannot lead to dismissal of these claims.

Next, Defendants argue that Moore's signing of the Deal Memo, which contained a section referencing a prior "Publishing Agreement," ratified the allegedly fraudulent agreement, such that Plaintiffs have waived any right to object to it. (Doc. 22 at 24-25.) Specifically, Defendants point to a provision in the Deal Memo that states, "[t]he existing publishing agreement shall remain in full force and effect with respect to any compositions written prior to execution hereof." (*Id*. at 24.) Defendants interpret this provision to reference the same "Publishing Agreement" on which Plaintiffs allege that Moore's signature was forged. (*Id*. at 24-25.)

Defendants are correct that when a "party knowingly accept[s] benefits under [an] agreement through silence and/or performance," the opposing party

[8] Maverick City Music and Maverick City Publishing are the counterparties to the Publishing Agreement. (Doc. 22-1.) Although the complaint does not specifically allege that Maverick City Publishing participated in the forgery, it suggests that Maverick City Publishing may simply be a trade name or "d/b/a" for Maverick City Music. (Doc. 1 ¶ 13.)

can assert ratification even in the context of an allegedly forged signature. *See U.S. Bank Tr. Nat'l Ass'n v. Chieftain Atlanta, L. P.*, 361 Ga. App. 186, 191 (2021). However, ratification is an affirmative defense that can only be shown if "a principal, with full knowledge of all the material facts, accepts the benefits of an unauthorized act . . . or retains such benefits after discovering the material facts." *Brock v. Yale Mortg. Corp.*, 287 Ga. 849, 855 (2010); *U.S. Bank Tr.*, 361 Ga. App. at 189. Whether ratification has occurred is typically a "fact question for the jury." *Brock*, 287 Ga. at 854.

The Court finds that it cannot, at the motion-to-dismiss stage, dismiss Plaintiffs' claims based on ratification. Plaintiffs contend there is a factual dispute over what "existing publishing agreement" the Deal Memo was referencing. Plaintiffs claim the Deal Memo referred to an independent verbal agreement Moore made with Gyamfi regarding publishing royalties whereas Defendants claim it refers to the "Publishing Agreement." (*See* Doc. 22 at 24-25; Doc. 29 at 24.) Defendants argue these facts regarding an independent verbal agreement were not presented in the complaint, and so should not be considered by the Court. (*See* Doc. 35 at 3-4.) Defendants are correct that the Court generally cannot consider facts outside the pleadings, but neither may the Court construe the complaint's allegations in Defendants' favor. The Court would be doing just that if it accepted as truth, at the motion-to-dismiss stage, Defendants' argument that the "Publishing Agreement" referenced in the Deal

Memo necessarily is the one attached to Defendants' motion to dismiss. Thus, construing the allegations in Plaintiffs' favor, the Court will not dismiss these claims based on ratification.

However, the Court will GRANT the motion to dismiss as to the Insignia Defendants and the TRIBL Defendants, as Plaintiffs have not plausibly pled that these defendants were involved in computer forgery or identity fraud. (*See* Doc. 1.) Accordingly, the motion to dismiss is DENIED as to Defendants Gyamfi, Maverick City Music, and Maverick City Publishing, but GRANTED as to the Insignia Defendants and the TRIBL Defendants.

### E. Rescission of Publishing Agreement and Deal Memo (Count VII)

Defendants also move to dismiss Plaintiffs' rescission claim, seeking rescission of "all agreements between Moore and Defendants[.]" (Doc. 1 ¶ 130.) "Rescission is an equitable remedy that restores the parties to a transaction to their status quo." *In re Wells Real Est. Inv. Tr., Inc. Sec. Litig.*, No. 1:07-CV-862-CAP, 2012 WL 12888849, at *4 (N.D. Ga. Sept. 26, 2012). Defendants' argument in favor of dismissal is that Plaintiffs' rescission claim fails for privity reasons. (*See* Doc. 22 at 21-22.) Defendants are correct that "[u]nder the common law, the remedy of rescission is available only between parties who are in privity of contract." *Greenwald v. Odom*, 314 Ga. App. 46, 57 (2012). As for the Publishing Agreement, Defendants argue Plaintiffs are only in

privity with Maverick City Music and Maverick City Publishing. (Doc. 22 at 21-22.) The Court agrees with Defendants on this point. (*See* Doc. 22-1.)

As for the Deal Memo, Defendants argue Plaintiffs are not in privity with any of the Defendants. (Doc. 22 at 21-22.) On this point, the Court disagrees because, as explained above, there is still a factual question as to whether "TRIBL Music Group" encompasses Defendants TRIBL Publishing and TRIBL Records. (*See* Doc. 22 at 14-15; Doc. 29 at 16-19.) Given this dispute, the Court cannot say for certain whether Defendants TRIBL Publishing and TRIBL Records are in privity with the Plaintiffs, and so it cannot dismiss on that basis.

Therefore, the Court GRANTS the motion to dismiss the rescission claim against Insignia Holding, Insignia Assets, and Gyamfi because there is no privity between those Defendants and the Plaintiffs, but the Court DENIES the motion to dismiss as to Defendants Maverick City Music, Maverick City Publishing, TRIBL Publishing, and TRIBL Records.

**F. Equitable Accounting (Count VIII)**

Finally, Defendants move to dismiss Plaintiffs' equitable accounting claim. (*See* Doc. 22 at 22.) Defendants argue that in a breach of contract action, where a party may utilize the discovery process, equitable accounting is generally unnecessary. (*Id.*)[9] The Court agrees.

[9] Defendants also argue that there is no contractual privity between Defendants and Plaintiffs under the Deal Memo. (*See* Doc. 22 at 22.) For the

"[A]n accounting is . . . defined as '[a] legal action to compel a defendant to account for and pay over money owed to the plaintiff but held by the defendant.'" *Rasmussen v. Cent. Fla. Council Boy Scouts of Am., Inc.*, 412 F. App'x 230, 233 (11th Cir. 2011) (per curiam) (quoting Black's Law Dictionary 21 (9th ed. 2009)) (emphasis omitted). "An equitable accounting is not a proceeding to which every litigant has a right." *Herring v. Standard Guar. Ins. Co.*, 232 S.E.2d 544, 545 (Ga. 1977). Under Georgia law, a party may seek an equitable accounting in "[c]ases where accounts are complicated and intricate[.]" O.C.G.A. § 23-2-70(2); *see also nVision Glob. Tech. Sols., Inc. v. Cardinal Health 5, LLC*, 887 F. Supp. 2d 1240, 1276 (N.D. Ga. 2012). However, an accounting is "generally unnecessary" where a party "may utilize the discovery process" to uncover necessary documents and information. *Id.*

Here, Plaintiffs have provided no basis for this Court to determine that the ordinary discovery process would be inadequate, nor have they responded to Defendants' motion to dismiss this claim. (*See* Doc. 1; Doc. 29.) The Court, therefore, agrees with Defendants that the equitable accounting claim must be dismissed. The Court GRANTS Defendants' motion to dismiss Plaintiffs' equitable accounting claim (Count VIII).

---

reasons explained above, the Court disagrees with Defendants on this point, at least as to the TRIBL Defendants.

## IV. Conclusion

Defendants' motion to dismiss (Doc. 22) is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to Plaintiffs' unjust enrichment (Count II) and equitable accounting (Count VIII) claims. As for the breach of contract claim (Count I), the motion is GRANTED as to Defendants Insignia Holding, Insignia Assets, Gyamfi, Maverick City Music, and Maverick City Publishing, but DENIED as to Defendants TRIBL Publishing and TRIBL Records. As for the computer forgery (Count IV) and identity fraud (Count V) claims, the motion is GRANTED as to Defendants Insignia Holding, Insignia Assets, TRIBL Publishing, and TRIBL Records, but DENIED as to Defendants Gyamfi, Maverick City Music, and Maverick City Publishing. Finally, as for the rescission claim (Count VII) the motion is GRANTED as to Defendants Insignia Holding, Insignia Assets, and Gyamfi, but DENIED as to Defendants TRIBL Publishing, TRIBL Records, Maverick City Music, and Maverick City Publishing.

**SO ORDERED** this 31st day of August, 2026.

SARAH E. GERAGHTY
United States District Judge